WATSON, Judge.
Plaintiff, Loleta Lord Barber, filed suit against defendants, Dr. Louis A. Cayer and St. Francis Cabrini Hospital, Inc., to recover damages for a burn she received while undergoing surgery on her hip. A jury voted 11-1 to award Ms. Barber $25,000 and she was given judgment for this amount against the hospital and the co-administrators of the estate of Dr. Cayer, Henry C. Taylor and Patricia J. Von-Dameck. Dr. Cayer’s medical malpractice insurer is St. Paul Fire & Marine Insurance Company and the hospital’s is Argonaut Insurance Company, but judgment was not rendered against the insurers. New trial and remit-titur were denied. The trial court stated in its reasons that the jury was correct in finding both the doctor and the hospital employees at fault and guilty of independent negligence. As to the amount, it was “high” but did not shock “the judicial conscience”. (TR. 61) The doctor’s estate and the hospital have appealed from the judgment.
Ms. Barber was burned while under anesthesia when her leg came in contact with an x-ray machine. The hospital says its employees were not at fault, and Dr. Cayer’s attorney says he was not at fault. Both contend that the award of damages is excessive.
The hospital also alleges that the trial court erred in not allowing evidence of jury misconduct. This consisted of the proffered testimony of one juror, Mrs. James Foster, to the effect that written notes were relied on during the jury’s deliberations. The pertinent article of the Code of Civil Procedure, LSA-C.C.P. art. 1794, is substantially similar to the prohibition in the Code of Criminal Procedure, LSA-C. Cr.P. art. 793, and the trial court relied on the criminal case of State v. Ledet, 298 So.2d 761 (La., 1974), which held that use of notes is not per se prejudicial nor such gross misconduct as to nullify a jury verdict. The trial court correctly refused to allow the testimony as a matter of public policy, which encourages free interchange in the jury room and discourages jurors from impeaching their verdicts in violation of LSA-R.S. 15:470.
The facts, as they relate to the issue of liability on the part of the hospital and Dr. Cayer are as follows:
Ms. Barber injured her left hip in a fall, at the age of 68, and was admitted to Cabrini Hospital on August 26, 1973 for *1309 surgery which was performed on August 28 by Dr. Cayer.
Dr. Cayer died before trial. His operative report states in pertinent part:
“Upon uncovering the patient after the surgical wound was closed and a dressing applied, it was evident that when moving the patient’s leg medially toward the X-ray machine, the patient’s leg had touched the X-ray machine box which had the light still on and the patient sustained a second and possibly a third degree burn of the left lower extremity.” (C-l).
The circumstances under which Ms. Barber was injured were established by the testimony of Dr. T. E. Banks, who assisted Dr. Cayer, and Ms. Mary Ann Goss Reed, then a student x-ray technician. The x-ray machine used was under the sole control of two student technicians, Mary Ann Goss Reed and Ellen Baudin. The switch on the collimator or light box, which is a focus or guide for the x-rays, was left taped in an “on” position which caused the collimator to overheat. Ms. Reed testified that this was done at the direction of Dr. Banks. However, Dr. Banks attributed the taping to a misunderstanding with inexperienced technicians. Dr. Banks testified that this was an improper procedure; that there was no reason to tape the switch in the “on” position; and that the main power source should have been used to control the machine. Dr. Banks said the automatic cut-off on the collimator is a safety device which protects against excessive heat. It turns off the light after 15 seconds, but Ms. Reed testified the light remained on as long as five minutes during Ms. Barber’s surgery. The taping prevented the operation of the safety device.
Dr. Banks said it is customary for the surgeon in a hip nailing procedure to be very careful that the uninvolved leg does not touch the x-ray machine and receive an electrical shock. It follows that it would also be standard procedure to avoid touching the leg subject to the operation against the machine. Ms. Reed said that the operating surgeon is solely responsible for the movement of the subject leg, which is in traction. According to Ms. Reed, Dr. Cay-er’s reference in his operating report to moving the leg medially would involve his releasing the traction. Dr. Banks said Ms. Barber’s burn was more apt to be a contact than an electrical burn.
Dr. Banks, Ms. Reed and W. F. Terrell, a licensed x-ray technologist at Cabrini Hospital, all testified that they had never known of another patient being burned in this manner. Terrell did not reach the operating room until shortly before Ms. Barber’s operation was completed and was called in because of a complaint that the collimator was extra warm. Terrell confirmed that the collimator switch was taped. |
The hospital had the x-ray machine under the unsupervised control of two student technicians. These student technicians, Ms. Reed and Ms. Baudin, taped the collimator switch in the “on” position, either because of Dr. Banks’ instructions .or because of a misunderstanding, thereby allowing the collimator light to overheat and create a dangerous condition adjacent to the field of surgery. Taping the switch in the “on” position prevented the safety mechanism or cut-off from operating. Had it done so, Ms. Barber would not have been burned. However, she would also have escaped injury if Dr. Cayer had not manipulated her leg into contact with the x-ray machine. The hospital employees’ conduct and that of Dr. Cayer were both causes in fact of Ms. Barber’s injury.
The injury which Ms. Barber received was not an ordinary risk of major surgery and could have been prevented by the exercise of proper care. Both the hospital and the doctor were under a duty to guard the unconscious Ms. Barber against being burned by contact with the overheated x-ray machine. This is pointed up by the fact that none of the witnesses knew of another instance of such a burn in their extensive experience. The hospital was negligent in failing to properly supervise its student technicians; these technicians were *1310 negligent in allowing the collimator to overheat; and Dr. Cayer was negligent in manipulating Ms. Barber’s leg into contact with the x-ray machine.
The facts as they relate to the quantum awarded are as follows:
When Ms. Barber awoke from the anesthesia, Dr. Cayer told her she had been burned by the x-ray unit, because the light was left on. The hip gave Ms. Barber no post-operative trouble but the burn caused “a pulsating ache” (TR. 75) that almost induced nausea, as well as a muscle grabbing sensation, similar to a charley horse. The burn was still bothering Ms. Barber on the day of trial, when she was 72 years old. The burn had been treated by frequent washings wijh peroxide. Ms. Barber exhibited the scar on her left inner thigh to the jury, stating it was much smaller than it had been three years before when she received it. Ms. Barber is herself a registered nurse. Her only income is from social security. She testified that the burn causes her embarrassment when swimming and wearing shorts in the summertime.
Ms. Barber remained in the hospital from August 26 until September 21, 1973, and was subsequently hospitalized because of her hip from October 10, until November 11,1973, and from February 28, until March 4, 1974.
Dr. Palmer J. Texada, a board qualified general surgeon, testified that he examined the scar on the “anterior medial aspect of the left thigh” (TR. 110) in April of 1975. It was described as triangular, measuring 1%" by 28/4" by 2". The skin in the area is discolored, inelastic, worn out, hairless and thin, but had healed satisfactorily; a skin graft would not create much cosmetic improvement. Dr. Texada found no atrophy of the leg; no underlying damage to the muscles; and no functional impairment of the leg. Because of Ms. Barber’s age and the risk of further surgery, skin grafting or excision of the atrophic scar was not indicated. Dr. Texada could not determine whether Ms. Barber had a deep second degree burn, a third degree burn or a combination, because both exhibit the same residual scarring. Dr. Texada found Ms. Barber’s complaints of itching and burning in the area consistent with her injury. The inner thigh area is not subjected to a great deal of stress but the skin would be tight and contracted.
Roberta Waters, a trained nurse’s aide employed by Ms. Barber at her home after surgery, gave her general care as a bed patient. She put peroxide on the burn 10 or 12 times a day on oral instructions from Dr. Cayer. Dr. Cayer also prescribed Darvon, Valium and Anacin for pain. Ms. Waters took her patient to Dr. Cayer’s office in Alexandria five times and observed his treatment of the burn with peroxide. She testified that Dr. Cayer shook his head when observing the burn but said nothing further could be done until it healed, when plastic surgery could be performed. The burn was described as swollen and red like raw meat with a white area in the middle from which reddish fluid drained. A scab started forming around the first of February, 1974 which came off 15 days later. The large triangular shaped wound looked infected and swollen and measured about 5" by 4" by 4". Dr. Cayer instructed her not to cover it and to use nothing but peroxide. She massaged the other parts of the leg to relieve Ms. Barber’s pain. Although not present during Ms. Barber’s first two hospitalizations, Ms. Waters said that the wound must have been treated during those periods, and this treatment should be reflected in the hospital records unless someone was derelict in treatment or record keeping. During the third hospitalization, Ms. Waters was with Ms. Barber “day and night” (TR. 144) but did not treat the burn because it was healed. However, Dr. Cayer instructed her to continue with the peroxide treatment four or five times a day after Ms. Barber returned home.
Lois Whatley stayed with Ms. Barber at night and observed Roberta Waters treat the burn with peroxide.
The nurses’ record of the first hospitalization from August 26, through September 21, 1973 (C-l) refers to complaints of pain without reference to the source. Demerol *1311 and Tylenol were given. For some unexplained reason, these notes made not a single mention of the severe burn Ms. Barber had just received. On September 16, there is a note of “comp, left leg ache” and on September 17 a note that Tylenol was given for “pain in 1. leg” which is repeated on September 19.
The hospital records of Ms. Barber’s second hospitalization from October 20, through November 5, 1973 (C-2) refer to almost daily complaints of pain and pain medication: Percodan, Darvon, Dalmane and Valium. The nurses’ notes are abbreviated in the customary manner but refer on 10/20/73 to “burn — interior thigh — left leg”; on 10/21 state that Darvon was given for “leg pain and discomfort”; and on 10/28 state “Dressing to burn area intact”. Several notations refer to a dressing on the leg without identifying the area involved. There are also several notations that the patient is depressed, in pain, and/or crying. The complaints of pain, crying and depression are not identified with any particular complaint in the nurses’ records. Ms. Barber was transferred to the Natchitoches Manor Nursing Home from Cabrini Hospital by ambulance on November 5, 1973.
Ms. Mary Merville, who was and is a registered nurse at Cabrini Hospital, remembered Ms. Barber but no treatment of her burn. She testified that the hospital records show no complaints or treatment in reference to a burn following Ms. Barber’s initial surgery. The second admission was not on Ms. Merville’s floor and she was not familiar with that hospitalization. The third hospitalization records show no orders referring to treatment of a burn. Ms. Mer-ville testified that she had never used hydrogen peroxide in treating a burn, but that such treatment would be reflected in the hospital report if given. Ms. Merville did not remember a burn at all in connection with Ms. Barbér although she testified that second and third degree burns are serious injuries. Ms. Merville’s testimony was apparently given little weight by the jury, and we do not find it convincing. It is unreasonable to find no mention of Ms. Barber’s burn during her first hospitalization, unless, as plaintiff contends, mention of the burn was deliberately omitted.
Appellants contend that most of the postoperative pain to which Ms. Barber testified must be attributed to the hip nailing itself. However, Dr. Banks testified that, although hip nailing is major surgery, patients subject to it usually need pain killers for only a week or ten days afterward. Also, because patients subject to this procedure are in great pain before the operation, they often have less pain afterward than before. Dr. Banks said peroxide is generally used for deep wounds rather than superficial burns. Defendant’s expert, Dr. Texada, said he had no reason to question Ms. Barber’s statement that her operation gave her no trouble but the burn did, pointing out that pain is a subjective matter.
It is contended that the award of damages is excessive because Ms. Barber had no loss of wages and does not have a long life expectancy in which to suffer from her injury. However, it is axiomatic that damages cannot be computed with mathematical nicety. The jury apparently believed Ms. Barber’s testimony that she was still suffering pain at the time of trial, three years after the initial surgery. The mere fact of being 72 makes each year of Ms. Barber’s life more precious to her. She is entitled to be free of unnecessary pain during her last years despite the infirmities of age. Compare Molaison v. West Bros. of Thibodaux, 338 So.2d 726 (La.App. 1 Cir. 1976) where an award of $18,000 in general damages to a 72-year-old plaintiff who “suffered a moderate amount of pain”, 338 So.2d 730, was affirmed, despite plaintiff’s request for an increase.
It is also contended that the award resulted solely from the sympathy of 11 women on the jury for the female plaintiff. However, these jurors had an opportunity to view Ms. Barber’s scar and are in a better position than this court to evaluate the disfigurement to Ms. Barber’s person. Pride in appearance is not the sole prerogative of the young. The women on the jury apparently accepted Ms. Barber’s testimony *1312 that she still likes to swim and wear shorts while working in her garden during the summer. We cannot conclude that Ms. Barber is incapable of or unsuited to such activities merely because of her age. We find no abuse of the much discretion granted the trier of fact under LSA-C.C. art. 1934. It is significant that the trial judge, who heard all of the evidence, did not grant a remittitur or new trial. Jenkins v. Dixie Rental Tools and Casing Crews, Inc., 283 So.2d 271 (La.App. 1 Cir. 1973); writ denied, La., 285 So.2d 542.
For the foregoing reasons, the judgment of the trial court herein is affirmed. All costs are assessed against defendants-appellants, the estate of Dr. Louis A. Cayer and St. Francis Cabrini Hospital, Inc.
AFFIRMED.