378 So.2d 1073 (1979)
Rosalyn F. WEXLER
v.
A. R. Kaye OCCHIPINTI, d/b/a Cabana Club Apartments and Allstate Insurance Company.
No. 10454.
Court of Appeal of Louisiana, Fourth Circuit.
December 11, 1979.
Rehearing Denied January 18, 1980.
*1075 Jonathan M. Lake, New Orleans, for plaintiff-appellee.
Robert O. Homes, Jr., Metairie, for defendants-appellants.
Before BOUTALL, GARRISON and CHEHARDY, JJ.
BOUTALL, Judge.
Rosalyn F. Wexler sued the owner of the Cabana Club Apartments, A. R. Kaye Occhipinti, and his insurers, Allstate Insurance Company, for personal injuries and damages resulting from a slip and fall on a walkway of the apartment complex. A jury returned a verdict in her favor, and the defendants appeal from the resulting judgment.
The undisputed facts are that Mrs. Wexler had been a tenant in the Cabana Club Apartments for some ten years, and at the time of the accident was leasing and living in Apartment No. 38, which was on the second floor of a two-story building. The apartments were arranged in two long two-story buildings facing an inner courtyard containing a pool and patio area. Mrs. Wexler's apartment was on the second *1076 floor, and down along the front of that row of apartments was a walkway or gallery, upon which each apartment opened and was for the common use of the tenants. While returning home one night Mrs. Wexler slipped and fell on this walkway and received injuries. The exact point of the slip is in dispute.
A number of assignments of error have been urged to us, but all of them basically revolve about the location of Mrs. Wexler's slip and fall, and the cause thereof. Each apartment had the compressor end of a room-type air conditioner protruding through the wall above the walkway. These machines dripped to a more or less degree upon the walkway when in operation. It is Mrs. Wexler's contention that she slipped on a slippery or slimy substance which dripped on the walkway from the air conditioner in the apartment next door to hers, which was occupied by the son of the defendant apartment owner. The defendant contends that Mrs. Wexler slipped in front of her own apartment and that if the dripping there constituted a dangerous condition, Mrs. Wexler could not recover because the lease between them provided that she was responsible for the maintenance of the apartment, and that the landlord's liability would attach only after failure to cure a defect after written notice.
The evidence preponderates that Mrs. Wexler slipped in front of the neighboring apartment occupied by Dennis Occhipinti where the condensation drippings from that air conditioner ran across the walkway. The evidence clearly shows that the defendant employed a caretaker whose duty it was to keep the area clean and safe, but this caretaker had been on a two-week's vacation. There is sufficient evidence to support a finding that the maintenance of the area was poor and that it was seldom, if ever cleaned. It is undisputed that the area had not been cleaned in a period of over two weeks. The constant dripping of water from an air conditioner across this walkway would obviously create a dangerous and slippery condition constituting a hazard to those persons who had to use the walkway.
We conclude that the dripping of the moisture coupled with the lack of maintenance prior to the fall caused plaintiff to slip and injure herself.
Because of the location of the slip, that is, not in the premises leased by plaintiff nor caused by her air conditioner, the responsibility provisions of the lease are not applicable to this case, and that defense is unavailable to the defendants. Instead, plaintiff's right arises out of the obligations of a lessor to his lessee as stated in Civil Code Article 2695:
"Art. 2695. The lessor guarantees the lessee against all the vices and defects of the thing, which may prevent its being used even in case it should appear he knew nothing of the existence of such vices and defects, at the time the lease was made, and even if they have arisen since, provided they do not arise from the fault of the lessee; and if any loss should result to the lessee from the vices and defects, the lessor should be bound to indemnify him for the same."
Based on this codal provision, the principle is well established that a lessee who, without fault, sustains an injury caused by a defect in the leased premises is entitled to recover damages from his lessor. Bates v. Blitz, 205 La. 536, 17 So.2d 816 (La.1944); Sabin v. C. & L. Development Corp., 141 So.2d 482 (La.App. 1st Cir. 1962); Green v. Southern Furniture Co., 94 So.2d 508 (La.App. 1st Cir. 1957); Gaida v. Hourgetts, 67 So.2d 737 (La.App. Orleans, 1953); Estes v. Aetna Casualty & Surety Company, 157 So. 395 (La.App. Orleans, 1934). The owner-lessor is held to strict liability as we stated in Phillips v. Cohen, 183 So.2d 473 (La.App. 4th Cir. 1966) at page 475:
"`Under Louisiana law, particularly L.S.A.-C.C. Articles 670 and 2322, the owner-lessor is held to strict liability, i. e., liability without fault on his part, for personal injuries sustained as a result of the defective condition of the leased premises and he cannot successfully defend on the basis of ignorance of the condition of the building or of the fact that the defect could not be detected; knowledge of even latent *1077 defects for which he is responsible is imputed to the owner-lessor and he is presumed to know of them.'"
In this case, the liability of the owner-lessor is based not only on his strict liability but additionally upon the factual finding of fault or negligence which we have detailed above. The walkway or approach to the door of plaintiff's leased apartment is within the responsibility of the lessor to the lessee. Glain v. Sparandeo, 119 La. 339, 44 So. 120 (La.1906); Estes v. Aetna Casualty & Surety Company, supra.
Alternatively, the appellant contends that the plaintiff was contributorily negligent, had assumed the risk, or that plaintiff should have used an alternate path, having been aware of the dangerous situation. As we appreciate the evidence, while plaintiff knew that the air conditioners did drip upon the walkway, the plaintiff was not aware that the walkway was made as slippery as it was on this circumstance. Plaintiff had traversed the walkway on numerous occasions and had not slipped and fallen previously. Indeed, on this occasion, plaintiff's escort had traversed the walkway immediately in front of her and had not slipped. As we stated above, it was not simply the fact condensation had dripped in the area, but that combined with the non-cleaning of the area for several weeks had caused it to become obviously much slipperier than it had previously been. Plaintiff testified that she was being careful and attentive of her path when the slip occurred, and we have no reason to disbelieve her testimony. Those defenses are simply not proven by defendant. See Revon v. American Guarantee & Liability Ins. Co., 285 So.2d 354 (La.App. 4th Cir. 1974), damages amended 296 So.2d 257; Anderson v. Sciambra, 310 So.2d 128 (La.App. 4th Cir. 1975).
We next consider defendant's assignment of error based upon the rulings and remarks by the trial judge and remarks made by plaintiff's attorney, which defendant contends has prejudiced its defense and prevented a fair trial.
In connection with plaintiff's attorney's remarks, the defendant contends that during the examination of prospective jurors, plaintiff's attorney remarked that defendant's attorney was unethical, and later on in the trial, in connection with the examination of the treating physician, defendant's attorney made an attempt to make him appear unethical in securing authorization to obtain copies of plaintiff's medical records, and particularly the possession of the doctor's office notes. As to the first, that is, the remark during voir dire, that portion of the trial was not recorded, and there is nothing upon which we could base an examination, much less a conclusion. As to the examination into the authorization for obtaining medical records, we simply note that this came towards the end of the trial and that the trial had been a long and bitter contest. Everything was put at issue by both parties, and while defendant was cross-examining the treating physician, he produced the doctor's office notes, which plaintiff's attorney had apparently never previously seen. An encounter occurred as a result of this, with plaintiff's attorney demanding to know, and attempting to find out, how these notes were obtained. Whatever inference may be made from this evidence is a matter for the jury to consider, and we see nothing prejudicial about it.
Appellant complains of a number of remarks and rulings by the trial judge, which he alleges constituted prejudice individually and in toto. In considering these complaints we note the following. Defendant objected that a fellow tenant of plaintiff was not permitted to compare her lease with the plaintiff's lease. The ruling was correct, there being no foundation laid to show that she knew what was contained in the leases.
Defendant next complains that the judge accused him of attempting to confuse the jury during the cross examination of an actuary, Dr. Wolfson. We note that there was a long interchange between the parties and the court as to the salary basis for computation of past and future loss of wages. The defendant attorney persisted *1078 in an attempt to establish use of several past year's income taxes rather than the present salary as a basis. Finally the court stopped him and in so doing did indeed make a comment on the evidence during his ruling. However it was in explanation of the ruling and the court pointed out to the jury that it could make its own determination, and that it was the jury's function to do so. The remark of confusing the jury was brought up in this context, and we find that the trial judge was simply trying to sort the evidence so that the jury could understand its relevancy, and we find nothing wrong with his remark.
The defendant additionally complains because the judge would not continue the case although an emergency arose as to the defendant's mother. The defendant was permitted to leave the court, but his counsel insisted upon a continuance because he felt that he could not continue under the circumstances. Yet he makes no showing to us of any undue inconvenience or prejudice. Similarly he complains because the judge was less courteous to him than to plaintiff's counsel and interrupted him more often. We make no effort to count the number of interruptions and frankly we agree with nearly all of the trial judge's rulings.
There are a number of other complaints, however we will comment only on several others. Defendant complains about the apparent contradictory rulings of the trial judge as to permitting the lease in evidence. Suffice it to say that the lease was permitted in evidence for the jury to read and consider. It is evident that the trial judge was concerned with the relevancy of the lease because of the question of the location of the accident, that is, whether the accident occurred within the space encompassed by the lease. That location was a factual determination to be made by the jury, and we do not agree with the rulings of the trial judge by first letting the lease in evidence, then withdrawing it and then letting it back into evidence. Nevertheless it was in evidence and in view of the determination we make as to the location of the accident, we can see no prejudice.
Similarly, we do not agree with the trial judge's ruling that the counsel could not ask a leading question on cross examination, nor with his ruling that a hearsay answer could not be stricken because the answer came before the attorney's prompt objection. However, in neither case do we note any serious problem. The leading question issue was cured by continued examination along the same line. The hearsay issue was modified by the offer to connect the statement with testimony of other witnesses.
We have recited a number of the errors urged by appellant because of his allegations of prejudice and unfair trial. Our examination of the record convinces us that there was no prejudice to the defendants and that a fair trial was had. The trial was a long and hard fought one, and there were numerous interchanges between counsel. The trial judge is charged with the duty of regulating the conduct of the trial and keeping from the jury irrelevant evidence in order that the jury may make a fair determination of the issues between the parties. We conclude that the trial judge has carried out his duties and find no prejudice.
The next assignment of error is the giving of jury instructions. The first complaint is that the judge gave certain requested jury instructions of the plaintiff. We do not discuss this matter except to simply note that the charges of which appellant complains were actually refused by the trial judge and other jury instructions were given. The second complaint is the judge's charges on contributory negligence. We note that the judge gave a proper charge on contributory negligence in his main charge and that most of the special instructions urged by both parties were refused simply because they were covered in the main charge. We believe the charges given to be sufficient to fairly apprise the jury of the law involved. To defendant's complaint of failure to give certain requested charges on damages, our answer is the *1079 same. The general charge adequately explained the law on damages to the jury, and the requested charges would be superfluous.
We now pass to a consideration of quantum. The jury verdict listed the damages in four categories:

 1. For pain and suffering, past and
 future: $185,000
 2. For medical expenses, past and
 future: 13,300
 3. For loss of past wages: 17,000
 4. For future lost wages: 0

Appellant only seriously complains of the award for pain and suffering, past and future, contending it is excessive because her injuries were not as great as plaintiff alleged, and because prior jurisprudence has not established an award of that magnitude for similar injuries. Our review of general damages awarded under Civil Code Article 1934(3) is governed by the proposition that much discretion must be left to the jury. Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963). The principles of appellate review have most recently been refined in the case of Reck v. Stevens, 373 So.2d 498 (La.1979). We quote the scope of our inquiry at page 501.
Thus, the initial inquiry must always be directed at whether the trier court's award for the particular injuries and their effects upon this particular injured person is, a clear abuse of the trier of fact's `much discretion,' La.Civ.C. art. 1934(3) in the award of damages. It is only after articulated analysis of the facts discloses an abuse of discretion, that the award may on appellate review, for articulated reason, be considered either excessive, Carollo v. Wilson, 353 So.2d 249 (La.1977); Schexnayder v. Carpenter, 346 So.2d 196 (La.1977), or insufficient, Olds v. Ashley, 250 La. 935, 200 So.2d 1 (1967). Only after such determination of abuse has been reached, is a resort to prior awards appropriate under Coco [v. Winston Industries Inc., 341 So.2d 332] for purposes of then determining what would be an appropriate award for the present case.
In the initial determination of excessiveness or insufficiency, an examination of prior awards has a limited functionif indeed the facts and circumstances of the prior awards are closely similar to the present. The prior awards may serve as an aid in this determination only where, on an articulated basis, the present award is shown to be greatly disproportionate to past awards (not selected past awards, but the mass of them) for (truly) `similar' injuries, see Coco at 341 So.2d 334.
However, absent an initial determination that the trial court's very great discretion in the award of general damages has been abused under the facts of this case, the reviewing court should not disturb the trier's award. Wilson v. Magee, 367 So.2d 314 (La.1979)."
Accordingly, we direct our initial inquiry as to the particular injuries and their effects upon the plaintiff. Plaintiff was a 55 year old widow in good health at the time of the accident. She was self-sufficient and lived in the apartment complex alone, and supported herself by daily work. Additionally, she enjoyed an active social life and engaged in many activities both for pleasure and for the daily requirements of ordinary living.
After she fell on the walkway she was taken to the hospital where it was diagnosed that she had a comminuted fracture of the trochanteric region of the femur. The fracture went completely through the bone from the greater trochanter to the lesser trochanter. Because the needed operation was a rather strenuous one, she could not be operated upon immediately, but was required to remain under sedation for several days until her tolerance of the operation could be established. The operation consisted of an open reduction by incision along the thigh and hip resulting in approximately a two foot scar. The leg is held in place with a device called Russel's traction, and the fragments of the bone are then held together by the placing of a Jewett's nail which runs through the bone towards the head of the femur, and the bottom *1080 of the nail fixed to the side of the femur by a plate screwed on with four screws.
The testimony of the doctor indicates that the patient normally suffers rather acute pain after this type of surgery, and indeed it was noted during the course of recovery that Mrs. Wexler suffered spasms of the muscle with some frequency. Additionally, she had severe abdominal cramps together with constipation and inactivity of her bowels. Her pain and discomfort was heightened by the onset of post-operative depression, which is to be sometimes expected as a result of this type of injury and operation. During this period of time, the Russel's traction was continued to hold her leg and hip in the proper position for healing, and this restricted her motion considerably. As a result whenever she attempted to move it caused her considerable pain. The fracture began healing and after a month or so Mrs. Wexler was discharged from the hospital and permitted to use a four-legged walker. A month later, in the first part of October she returned to the doctor for examination, complaining of considerable pain at the site of the operation. X-rays revealed that the tip of the Jewett's nail was proceeding into the head of the femur because the bone at the fracture site was undergoing resorbsion, that is, disappearing such as to cause the two bone fragments to move together and the fixed nail must then go forward further up into the head of the femur. This condition continued until the nail had gone completely through the head of the femur and was affecting the acetabulum or hip socket. This of course is an extremely painful condition, but because the bone had not sufficiently healed to permit removal of the Jewett nail, the doctor instructed her to not place any weight upon that leg, until he could operate. It was not until December that the fracture site had healed sufficiently enough to permit another operation to remove the Jewett nail.
Mrs. Wexler went through that operation, and of course it was equally painful. However, healing resulted in normal course and she was discharged from the hospital and permitted to use her walker for several months until April 23rd, 1976. At that time she was started upon a course of physical therapy approximately three times per week until September 1976. By this time she had been sufficiently rehabilitated to where she could be discharged from treatment in November. Of course it should be noted that during this almost year and one-half of treatment, Mrs. Wexler had been totally dependent upon friends and relatives for nearly every function of daily life.
Unfortunately for Mrs. Wexler, although she was discharged as having reached maximum recovery from rehabilitation, she has permanent residual injuries which have completely changed the course of her life as it existed prior to the accident. Because of the resorbsion of the bone at the fracture site and the resulting necessity for early removal of the Jewett pin, she suffered a varus deformity of the femur in the trochanteric area. This is described to be a 10 to 15 degree lessening of the angle at the top of the femur, and this together with the resorbsion of the bone caused a shortening of the leg. Her left leg is now 3/4 of an inch shorter than her right leg and this will remain permanently, although it is possible to be cured by a further operation wherein the bone would be sawed through and then rebound in order to attempt to adjust the angle.
In addition to these deformities, Mrs. Wexler suffers from a limp called a gluteal lurch resulting from weakness of the gluteal muscles as a result of the surgery and the varus deformity mentioned above. She has a restriction of the rotation of her hip inward, and suffers from osteoporosis, loss of some of the mineral content of the bone. She must wear a built up shoe in order to correct to some degree these residuals, but she will always walk with a limp and stand with one shoulder higher than the other in order to compensate for the leg shortening.
The doctor has assigned to her a 25% permanent disability of her body and informs us that she will be unable to comfortably walk for any prolonged distance, sit *1081 uninterruptedly for any prolonged period of time or climb stairs or any kind of climbing frequently. He relates that Mrs. Wexler will continue to suffer pain and discomfort from time to time and this is consistent with Mrs. Wexler's complaints of pain not only during the course of treatment, but since discharge up to the time of trial. It is apparent that she will have these deformities and the resultant pain permanently.
In articulating our analysis of the facts of injury and the result upon this plaintiff, we cannot say that the award is considered excessive. Finding no abuse of discretion, we do not resort to the prior awards proposed to us for consideration by the appellant. Accordingly, we affirm the jury award of $185,000 for pain and suffering, past and future. As noted above, the other awards are not disputed.
The only other issue in this appeal is appellant's contention that the trial judge erred in granting a directed verdict against appellant in favor of a third-party defendant, P.P.G. Industries, Inc.
In the initial investigations into the slip and fall of plaintiff, there was some reason to believe that the slip may have occurred as a result of slippery paint that had been purchased from P.P.G. upon its recommendation that it was a special non-skid paint for use on patios and outdoor decks. Accordingly, P.P.G. Industries, Inc. was made a third-party defendant by the appellants, and also made a defendant by plaintiff Wexler. In the course of the jury trial, the trial judge concluded that after the termination of evidence that there was insufficient evidence to support a judgment against P.P.G., and accordingly upon motion of P.P.G., the court dismissed it from the suit. C.C.P. Article 1810.
Appellants contention is based solely upon plaintiff's pretrial deposition in which plaintiff indicates that the paint was slippery. However, on trial the plaintiff did not complain that the slip was caused by the paint, but stressed that the slippery nature of the walkway was because of the drippings from the air conditioner causing slime and grease. We agree with the ruling of the trial judge. Considering the evidence in this case there was no necessity for the third-party defendant to refute anything, simply because there was no evidence to show that its paint was responsible for the slip.
Accordingly, for the reasons above stated, the judgment of the trial court is affirmed at appellant's cost.
AFFIRMED.