EDWARDS, Judge.
Plaintiff, Sallie Guillory, brought this action to recover damages for injuries sustained when the motorcycle upon which she was riding was struck by a truck owned by Avondale Shipyards, Inc.[1] Named as defendants were Avondale Shipyards, Inc. and its liability insurer, The Travelers Insurance Company. Trial was conducted before a jury. After presentation of all evidence, plaintiff’s motion for directed verdict on the issue of liability was granted. The case then went to the jury on the issue of quantum. The jury returned a verdict for plaintiff in the amount of $398,859.89. Defendants appealed, challenging the granting of the directed verdict, the form of the special verdict submitted to the jury and the amount of plaintiff’s award. On appeal, this court concluded that the district court erred in granting the directed verdict and remanded the case for a new trial. Guillory v. Avondale Shipyard, Inc., 414 So.2d 799 (La.App. 1st Cir.1982). The Louisiana Supreme Court granted a writ of certiorari and reversed this court’s judgment. Guillory v. Avondale Shipyard, Inc., 420 So.2d 450 (La.1982). The Supreme Court ordered the case “remanded to the court of appeal to decide the case on the record.” 420 So.2d at 451.
Sallie Guillory and Merlin Pontiff were riding a motorcycle in an eastbound direction on Louisiana Highway 20, a two-lane highway. Guillory owned the motorcycle but Pontiff was driving. Guillory and Pontiff had been riding along with a friend, Eric Aucoin, who was driving another motorcycle. However, they had become separated from Aucoin and were attempting to catch up to him when Pontiff came up behind a line of four vehicles. The lead vehicle was an automobile which was followed by Aucoin. Immediately behind Au-coin was an Avondale Shipyards’ tractor-trailer truck driven by Clifford Collins. Behind that truck was another one driven by Charles Stansbury. Pontiff passed the truck driven by Stansbury without incident and began to pass the Avondale truck. When the motorcycle carrying Guillory and Pontiff was even with the cab of the Avon-dale truck, Collins began to change lanes. When Collins pulled over, the truck and the motorcycle collided, causing the motorcycle to leave the road. Guillory and Pontiff sustained serious injuries as a result of the accident.
Clifford Collins testified that he was driving east on Louisiana 20 at the time of the accident, having just delivered a load of steel beams for his employer. Collins’ truck *565 was behind Aucoin’s motorcycle. According to Collins, Aucoin pulled his motorcycle to the right of the road and slowed down, motioning for him to pass. Collins stated that he waited for an oncoming vehicle to pass, checked his left-hand outside rearview mirror and “glanced” to the left. Collins testified that he did not expect anything to be alongside his truck since a vehicle had just passed in the opposite direction. According to Collins, he saw nothing alongside his truck, put on his left-turn signal and pulled over to his left in order to pass Aucoin. Collins estimated that his truck was about two feet over the centerline when it struck the motorcycle carrying Guillory and Pontiff. Collins testified that he did not see the motorcycle until the impact occurred. Collins maintained that there was a “blind spot” in his mirror and that he was unable to see any vehicle located in that area. However, he conceded that by turning his head and looking back he could have overcome any such blind spot.
Merlin Pontiff testified that he was attempting to catch up with Aucoin when the accident happened. According to Pontiff, he passed the truck driven by Stansbury and pulled in between it and the Avondale truck. After waiting for an oncoming vehicle to pass, he then attempted to pass the Avondale truck. Pontiff estimated that the motorcycle was six feet to the left of the centerline, in the westbound lane, as he passed the truck and that the truck was two feet to the right of the centerline. Pontiff testified that Collins changed lanes suddenly as the motorcycle was alongside the truck and that he had no time to react to avoid the collision. Pontiff testified that he saw no left-turn signal on the truck prior to its lane change.
Sallie Guillory’s testimony was substantially in accord with Pontiff’s. However, she estimated that the motorcycle was three feet to the left of the centerline as it passed Collins’ truck. According to Guillory, the motorcycle was even with the truck driver’s door when the truck began to change lanes.
Eric Aucoin was in front of the accident when it occurred. However, he testified that he did look back as Pontiff and Guillo-ry were passing the Avondale truck. He estimated that the motorcycle was three to four feet from the centerline at the time the truck crossed over and struck it. Au-coin stated that the truck gave no turn signal before changing lanes. Aucoin admitted that he had slowed down when Collins attempted to pass. However, he contended that he did so because the automobile in front of him was slowing down. According to Aucoin, he signaled with his arm that he was slowing down because his motorcycle had no brake lights.
Charles Stansbury, driver of the truck which was behind the Avondale truck, testified that Pontiff’s motorcycle was on the centerline of the highway when it passed him. On direct examination by counsel for defendants, Stansbury maintained that it was still on the centerline when Pontiff attempted to pass the Avondale truck. However, Stansbury’s credibility and memory were called into serious question at trial. Stansbury testified that the road was slippery and wet at the time of the accident, while all of the other witnesses agreed that the road surface was dry. Stansbury was the only witness to place the point of impact at the back of the truck, all others agreed that the motorcycle and the truck collided at the cab, near the front of the truck. Stansbury gave an earlier statement to an investigator for plaintiff’s counsel in which he stated that he did not know how close the motorcycle was to the Avondale truck when passing because he was paying more attention to the truck. Finally, in that statement, and under cross-examination by counsel for plaintiff, Stansbury admitted that the Avondale truck crossed over the centerline before striking the motorcycle carrying plaintiff. These contradictions and inconsistencies, coupled with Stans-bury’s admission at trial that he did not remember much, rendered his testimony worthless.
Louisiana State Police Trooper Michael Simon conducted an investigation of the accident. Based on his interviews with the drivers and witnesses, as well as the limited *566 physical evidence, he concluded that the motorcycle collided with the truck at the left-hand side of the cab, below the driver’s door. Trooper Simon also concluded that the collision occurred in the westbound lane of Louisiana 20, but was unable to determine how far from the centerline.
Defendants introduced a number of photographs of the Avondale truck and a motorcycle similar to plaintiff’s. These photographs were taken by an investigator employed by defendants’ counsel and purported to demonstrate what the driver of the truck could see in his rearview mirror and out of the left-hand window. In those photographs, the truck was positioned two feet to the right of the centerline, which is where most eyewitnesses estimated it was located. Additionally, in all of the photographs the motorcycle was positioned with the center of its tires thirteen inches from the centerline. This positioning was used at the direction of defendants’ counsel. None of the credible witnesses who testified, including Collins himself, placed the motorcycle at that distance from the cen-terline of the highway. Therefore, those photographs are worthless for purposes of determining what Collins could or should have seen at the time of the accident.
LSA-R.S. 32:79 provides, in pertinent part, as follows:
“Whenever any roadway has been divided into two or more clearly marked lanes for traffic, the following rules, in addition to all others consistent herewith, shall apply.
“(1) A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.”
Since Collins was traveling on a roadway which was divided into two lanes, this statute is applicable to his conduct.
Sevin v. Diamond M Drilling Company, 261 So.2d 375 (La.App. 1st Cir.1972), involved an automobile accident which occurred in a factual situation similar to the instant case. In Sevin this court summarized the duty of a motorist in Collins’ position as follows:
“The factual situation thus presented is that of a motorist traveling in a line of traffic who suddenly and abruptly moved from the driving lane into the passing lane at a time when it was unsafe to do so because of the presence of an overtaking vehicle. In such a case we deem it to be negligence for a motorist traveling under such conditions to attempt to pass the motorist in front of him without first ascertaining that the maneuver can be made without endangering either oncoming or following traffic, the latter being the case here. A comparable situation is presented where the overtaken motorist attempts a left turn when it is unsafe to do so because of the presence of overtaking traffic. Jacobs v. State Farm Mutual Automobile Insurance Company, 191 So.2d 908 (La.App. 1st Cir.1966). Also comparable is the situation of a motorist changing lanes on a multi-lane highway without regard to following traffic. Blanchard v. Hardware Mutual Casualty Company, 153 So.2d 517 (La.App. 1st Cir.1963). The rule common to these cases seems to be that movements to the left across or into a traffic lane where normal passing is permitted should not be made without first ascertaining that such a maneuver can be executed safely and without danger to normal overtaking traffic.” 261 So.2d at 378.
See also Doucet v. Ryder Truck Rentals, Inc., 415 So.2d 618 (La.App. 3rd Cir.1982).
Before initiating his passing maneuver, Collins was under a duty to ascertain that it was safe to move his truck into the other lane. Our review of the evidence convinces us that he failed to take reasonable steps to ascertain that it was safe to change lanes.
Credible testimony in the record establishes that the motorcycle carrying plaintiff was approximately three feet left of the centerline, alongside the Avondale truck, when Collins initiated his passing maneuver. Collins saw nothing in his rearview mirror, but knew that there was a blind *567 spot in his mirror. He also knew that he could overcome his blind spot by turning his head and looking back. He did not do so, however, because he was relying upon the assumption that nothing would be alongside so soon after the passing of an oncoming vehicle. We conclude that Collins acted unreasonably in relying upon his assumption. It is clear from the evidence presented that Collins would have seen the motorcycle carrying Pontiff and Guillory had he looked back and the accident would have been avoided. Nothing prevented Collins from waiting to fully ascertain the safety of changing lanes before passing Aucoin. No emergency or exigent circumstances required Collins to pass when he did and he admitted that he could have waited before passing.
Since Collins’ negligent actions were the cause of plaintiffs injuries, defendants, Collins’ employer and its liability insurer, are liable for any damages sustained by plaintiff. We now turn our attention to the issue of quantum. Since the trial court’s directed verdict has been reversed, and we have been directed to decide this case on the merits, we are not bound by the original jury verdict but will fix an award based upon the evidence before us.
Guillory sustained a number of injuries as a result of the accident. She was taken to the emergency room at the South Louisiana Medical Center, where she was treated and admitted by Dr. Ian Reynolds, a resident orthopedic surgeon. Plaintiff was admitted to the hospital on the date of the accident, September 14, 1979. Dr. Reynolds testified at trial by way of deposition. According to him, plaintiff’s injuries included the following: A “crush” fracture of the right tibia at the knee joint; a third-degree burn just below the right knee measuring approximately six inches by three inches; abrasions to her left arm, chest, right arm and hand; and a laceration running the entire length of her left ear.
Guillory was placed in traction pending surgery for the broken leg. Immediate surgery was impossible because of fear of infection from the burn site. A type of traction known as “kick traction” was utilized. This type of traction involves use of an orthopedic frame to stabilize the patient’s leg while allowing some motion in the knee. It also required that a metal pin be inserted through the bone in plaintiff’s ankle. Guil-lory remained in kick traction for approximately three and one-half weeks, until surgery was performed to repair the fracture.
Guillory’s right tibia was fractured at the knee where it articulates with the femur to form the knee joint. According to Dr. Reynolds, the tibia was fractured into a number of pieces at this site and some of the underlying bone had been crushed. Dr. Reynolds performed surgery in order to restore the plateau of the tibia, the site which forms the knee joint. This surgery included a bone graft and installation of a screw into the fracture area to hold some of the larger bone fragments together. Material for the bone graft was taken from plaintiff’s right anterior iliac crest, a bone right above the waist. Following this surgery, plaintiff’s leg remained in a cast for approximately six weeks. She remained on crutches until February of 1980, when she began to walk with aid of a cane. At the time of trial in April of 1981, she was walking with a slight limp.
The burn on plaintiff’s right knee was originally diagnosed as an abrasion. It was not until about five days after the accident that it was diagnosed as a burn. Once this diagnosis was made, a procedure known as debridement was begun. This procedure involves the placing of wet gauze pads on the burn area and allowing them to dry for four to six hours. When dryed, the pads are pulled from the area along with any dead skin. The procedure is then begun anew with fresh wet gauze pads. Plaintiff underwent this debridement procedure for a period slightly in excess of one month. The abrasions on her right hand and fingers also were treated in this manner.
On October 25, 1979, plaintiff underwent a second surgery. This operation involved taking a piece of skin from Guillory’s left thigh and grafting it onto the burn area on her right leg. Guillory was discharged *568 from the South Louisiana Medical Center on November 1, 1979.
According to Dr. Reynolds, Guillory suffered a twenty-one percent impairment of her right leg. Dr. Reynolds testified that Guillory had lost thirty to forty degrees of full flexion in her right leg and she was unable to bend it beyond ninety degrees. Dr. Reynolds was of the opinion that plaintiff’s leg would stay in the condition it was in, getting neither better nor worse. He also testified that plaintiff will likely develop arthritis in the knee, with attendant pain and swelling. Dr. Reynolds was of the opinion that plaintiff might require surgery in the future to alleviate the pain or to change the surface of the tibia. He further testified that Guillory could work at any job which did not require any type of heavy lifting. Specifically, he testified that she was physically capable of driving a truck or a car, working at a fast-food establishment or in an office setting.
On May 8, 1980, plaintiff consulted Dr. Kenneth Diffenbach, a plastic surgeon, because she was dissatisfied with the results of her skin graft. According to Dr. Diffen-bach, only two-thirds of the graft had taken. He described that area which had taken as being scaly in appearance. After consultation with Dr. Diffenbach, Guillory elected to have a second skin graft performed. This operation was performed on July 10, 1980. Once again, skin was taken from the area of plaintiff’s left thigh and buttocks for placement on the burn site. This surgery required plaintiff’s hospitalization for a period of five days. According to Dr. Diffenbach, the most severe pain associated with such a procedure is that at the donor site which he described as being very much like a severe brushburn. The pain in that area is so great that it takes from twenty to twenty-five days before a patient can tolerate a bath and sit on the area even for a short period of time.
Dr. Diffenbach testified that a fifteen percent area of the second skin graft did not take. Additionally, oil glands from the original skin graft have erupted, causing irritation, itching and a pitted appearance. Dr. Diffenbach testified that even with improvement, there will always be a detectable difference between the graft area and the rest of the leg. This difference would not be concealed by an ordinary pair of nylon stockings. Additionally, Dr. Diffen-bach noted that plaintiff also had a poorly healed scar from orthopedic surgery extending the full length of her right knee on the lateral side.
Sallie Guillory testified with regard to the pain and discomfort which she suffered as a result of her injuries and subsequent surgeries. She also testified with regard to the limitations upon her activity which her injuries have caused. According to Guillo-ry, she suffers a weakness in her right leg which impairs her ability to stand for a long period of time and to dance or participate in sports. She also has occasional bouts of stiffness in the knee.
Additionally, Guillory testified about her employment history. Guillory, who was twenty-two years of age at the time of the accident, had worked at a variety of jobs, all for brief periods of time. Since 1976, until the accident in September of 1979, Guillory had worked at the following jobs: galley hand for an offshore catering company, helicopter refueler, bank employee, deckhand on a boat, supermarket cashier, waitress (twice), secretary, and, most recently before the accident, truck driver. Plaintiff introduced copies of W-2 forms and tax returns which established her income for the years 1976 through 1978 as follows: 1976 — $2,905.99; 1977 — $2,920.00; 1978 — $512.00. She also estimated that pri- or to her accident in 1979, she had earned $900.00.
Our review of the record establishes the serious and the painful nature of plaintiff’s injuries, her lengthy hospitalization and rehabilitation, continuing impairment and residual scarring. We believe that an award of general damages in the amount of $175,000.00 will adequately compensate her. Additionally, we will award plaintiff $11,359.89 for past medical expenses and $15,000.00 for future medical expenses. In light of plaintiff’s highly er- *569 atic work history, we deem an award of $2,000.00 for loss of past wages to be appropriate. In view of Dr. Reynolds’ testimony that plaintiff was physically able to return to the type of work which she had done in the past — waitress, secretary, truck driver — we conclude that an award for loss of future earnings is inappropriate.
For the foregoing reasons, the judgment of the district court, based upon the granting of plaintiff’s motion for directed verdict and the jury’s verdict, is reversed and judgment is hereby rendered in favor of plaintiff, Sallie Ann Guillory, and against defendants, Avondale Shipyards, Inc. and The Travelers Insurance Company, in the amount of $203,359.89, plus legal interest from the date of judicial demand until paid. All costs of these proceedings, both trial and appellate, are to be paid by defendants.
REVERSED AND RENDERED.
WATKINS, J., dissents and assigns reasons.

. Guillory’s suit was consolidated for trial with another suit, Merlin Pontiff v. Avondale Steel Sales; Division of Avondale Shipyards, Inc., et al. However, that suit was compromised and settled prior to trial and dismissed upon joint motion of the parties.
Avondale was erroneously identified in Guil-lory’s petition as “Avondale Shipyard, Inc.”