448 So.2d 1281 (1984)
Sallie Ann GUILLORY
v.
AVONDALE SHIPYARDS, INC. and the Travelers Insurance Company.
No. 83-C-1570.
Supreme Court of Louisiana.
February 27, 1984.
*1282 Michael J. Lamanie, Samanie & Barnes, Houma, Felix A. DeJean, III, Opelousas, for applicants.
Joseph Reilly, Henderson, Hanemann & Morris, Houma, for respondents.
WATSON, Justice.
The issue is whether the Court of Appeal correctly decided that plaintiff was entitled to an award of $203,359.89 after a jury's prior determination that the quantum of damages was $398,859.89.

FACTS
Plaintiff, Sallie Ann Guillory, was a passenger on a motorcycle traveling in an eastbound direction on Louisiana Highway 20, which was struck by a truck owned by Avondale Shipyards, Inc., and driven by an Avondale employee. At trial, plaintiff was granted a directed verdict on the issue of liability and a jury awarded her damages of $398,859.89. After the Court of Appeal reversed the directed verdict in favor of plaintiff,[1] a writ was granted. The judgment was reversed and the case remanded to the Court of Appeal to decide on the record.[2] Subsequently, the remand was "clarified" by an order stating that the directed verdict on liability was a correct result.[3]
After remand, the Court of Appeal determined that Avondale's employee, Clifford *1283 Collins, was negligent and that his negligence caused plaintiff's injuries resulting in liability for Collins' employer, Avondale Shipyards, Inc., and its insurer, The Travelers Insurance Company.[4] Thus, the issue of liability is settled. The trial court, this court and the Court of Appeals have all determined the issue of liability in favor of plaintiff.
In answers to special interrogatories, the jury decided that plaintiff was entitled to damages as follows:

Past physical pain and
 suffering $ 50,000.00
Future pain and suffering 50,000.00
Past mental anguish 25,000.00
Future mental anguish 25,000.00
Disability 50,000.00
Disfigurement 50,000.00
Past medical expenses 11,359.89
Future medical expenses 75,000.00
Past loss of earnings 2,500.00
Future loss of earnings 60,000.00
 ___________
 TOTAL $ 398,859.89

The Court of Appeal fixed damages as follows:

General damages $ 175,000.00
Past medical expenses 11,359.89
Future medical expenses 15,000.00
Loss of past wages 2,000.00
 ____________
 TOTAL $ 203,359.89

Judge Watkins dissented on the ground that Sallie Guillory should have been given an award for future loss of earnings.
The question is whether the Court of Appeal erred in reducing the jury's award by $195,500. In reviewing the jury's verdict, the Court of Appeal should have determined whether the jury's factual findings on plaintiff's damages represented an abuse of its "much discretion". LSA-C.C. art. 1934(3); Coco v. Winston Industries, Inc., 341 So.2d 332 (La., 1977).
The evidence on damages can be summarized as follows:
Sallie Ann Guillory was twenty-two years of age at the time of the accident, unmarried and unemployed. Her primary injury was to her right leg, although she also had multiple abrasions. Her left ear was split open and had to be stitched and she had deep cuts on her hand and wrist. She was unconscious after the accident and woke up on the side of the road with her leg hurting very badly. She was in the hospital for seven weeks. During her hospitalization, the doctors had difficulty in controlling her pain.
Dr. Ian John Reynolds, an expert in orthopaedic surgery, testified that Ms. Guillory sustained multiple fractures in her right knee and tibia with some bone being crushed. Since a burned area on the right knee precluded immediate surgery, she was placed in traction for about three weeks while the burned area was treated. After a hole was drilled in the ankle, a metal rod was placed through the distal part of the tibia to keep the knee stabilized. Ms. Guillory was unable to move while in kick traction from September 14 until October 9. She had a scar from the ankle pin which she displayed to the jury.
The third degree burn required many debridements of dead skin. According to her testimony, the debridement of the burn was very painful. The accident occurred September 14, 1979, and surgery was performed on the right leg on October 9, 1979. When the knee surgery was performed, Ms. Guillory was advised that the burn had not completely healed and there was a possibility of infection spreading into the bone but it was necessary to have the surgery before the knee started mending. A piece of bone was removed from the hip to graft into the knee. A sixteen millimeter screw was placed in the knee area to hold together the fragments. The screw will probably remain as a permanent implant. She remained in a rigid full leg cast for six weeks. On November 28, hinges were put in the cast to allow some motion in the knee. The cast was removed on January 7, four months after the fracture.
On October 25, Ms. Guillory's burn was grafted with tissue from her left thigh. On February 4, she was allowed to walk. On March 5, 1980, she complained of pain *1284 in her swollen right ankle; x-rays showed osteoporosis or some atrophy of the bone in the right ankle. The diagnosis was a sprained right knee and a soft tissue irritation of the right ankle. On April 9, she was again complaining of pain in the right ankle, and had some instability in the knee joint. On June 9, she had minimal symptoms in the right knee, but still complained of right ankle pain.
Ms. Guillory has lost thirty to forty degrees of flexion in the right knee and has a twenty-one percent permanent impairment of her entire right leg. She will have a tendency to develop arthritis and may need further surgery in order to either alleviate the pain or change some of the surface of the tibia. In Dr. Reynolds' expert opinion, people who have sustained fractures as bad as this one usually develop degenerative arthritis and Ms. Guillory will probably develop an arthritic condition with associated problems of pain, swelling, and limitation of motion. She also may develop instability in the joint. Sallie Guillory limps and she cannot anticipate further improvement in the leg. Dr. Reynolds recommended against heavy labor or lifting over twenty-five pounds and testified that Ms. Guillory would have trouble maneuvering because she has some limitation of motion and stiffness.
Dr. Kenneth M. Dieffenbach, a board certified plastic surgeon, saw Sallie Guillory on May 8, 1980, when she complained about the appearance and function of her right knee. She had been wearing pants to cover the appearance of the knee and hoped that further surgery would enable her to wear skirts. The original skin graft only covered about half the burned area and the remainder was scar tissue. The original skin graft was of a type called a mesh graft in which the donor skin heals with a scale like appearance. In addition to the scaly skin graft area, there was another area where the graft did not take. Over the kneecap there was a thin layer of scar tissue without any insulating fat on top of the bone. In addition to the scar from the injury, there was a poorly healed orthopaedic scar which Dr. Dieffenbach described as having a poor stigma of stitches. It was impossible to excise the orthopaedic scar without robbing the knee of more tissue and putting further tension on the graft.
Although Dr. Dieffenbach could not obliterate the scarring, he felt that he could improve the leg's appearance. He and Ms. Guillory elected to use the thigh/buttocks area for the donor tissue, which left another scar. The surgery was scheduled July 10. A rather thick piece of skin was taken from Sallie Guillory's left upper thigh and buttocks. She spent about three hours in the operating room under full anesthesia for this surgery and stayed in the hospital approximately five days. The donor site was described as a very painful area, particularly uncomfortable because it was on the buttocks. According to Dr. Dieffenbach "donor sites hurt notoriously" (Tr. 329). It took approximately three weeks for this area to heal satisfactorily with Ms. Guillory being unable to bathe, shower or sit for that period. The discomfort was described as essentially lasting ten to twelve days, with some sensitivity after that time. The graft was uncovered ten days after surgery, but the knee remained in a splint for another three weeks. Over a year after the accident, Sallie Guillory was still wearing an ace bandage on the knee to keep pressure on the graft. Fifteen percent of the graft did not take; there was some pitting on the rest.
Dr. Dieffenbach was disappointed with the result of his surgery. As a result of the graft, Ms. Guillory has fifty percent better padding on the knee and a twenty percent better appearance. From a cosmetic viewpoint, he described the knee as eighty percent different from the other knee. Since the defect could not be covered with ordinary attire such as nylon stockings, he regarded the knee, esthetically, as one hundred percent different from the other knee. Functionally, the graft, coupled with the orthopaedic injury, will prevent Ms. Guillory from playing basketball, racketball, any contact sport, anything played on a hard floor, or anything requiring *1285 shorts. The knee is restricted in function and cannot be exposed to the sun or bruised. The grafted area will be darker in the summertime and lighter in the wintertime than the surrounding tissue. Sallie Guillory cannot do anything that might require a kneeling position. A protective pad would aggravate the graft. While the leg will never look good enough for a bathing suit, it may be possible with a double pair of stockings or support stockings for Sallie Guillory to wear dresses. Because the injury remains highly visible and Sallie Guillory is a young girl, Dr. Dieffenbach said she would continue to feel incomplete and compromised in her dress. The scarring will be a constant remainder of the accident. On her right hip, there is a three to three and a half inch scar where they took the bone for the bone graft, as well as a scar on the inside of her left thigh from the skin graft. The jagged, uneven, boney area under the kneecap can still be felt beneath the graft. Sallie Guillory must avoid jobs which require her to be on her knees, cause excessive perspiration, subject her to chemical irritation, a wet environment or restrictive clothing.
Ms. Guillory described her extensive course of physical therapy. She rides a bicycle six miles a day and walks as much as possible to keep her knee from being quite so stiff. She has trouble getting in and out of her car, walking, and riding her bike. She described her running appearance as that of a wounded duck. Because of dissatisfaction with the initial skin graft, she went to Dr. Dieffenbach, but the scar is still highly visible. The knee area is very sensitive and painful to the touch. She cannot tolerate any pressure on it and is unable to shave in the area; the pants she wears sometimes cause her pain. She avoids being seen in shorts or bathing suits, and keeps the knee wrapped outdoors. Although she had played baseball for three years she can no longer enjoy that game or ride horses. Due to weakness and pain in the knee, she lacks kicking power for swimming, and is no longer proficient at sports or fast dancing. She cannot remain in one position too long without pain and weather changes cause stiffness.
Ms. Guillory had been a waitress and cashier at Pizza Hut and Burger King, a bank employee, a galley hand at A.R.A. Catering, an offshore deck hand, and a "hot-shot" truck driver. Because she lived with her parents, she did not work steadily.
In 1976, Ms. Guillory earned $2,905.99 working for Petroleum Helicopters, as a cashier for Cannatas Supermarkets, a waitress at Pizza Hut and a secretary at A. & M. Pest Control. She is no longer able to stand on her feet for eight hour stretches; a requirement of being a cashier or waitress. Her job with Petroleum Helicopters involved loading baggage and working twelve hours a day, seven days a week. In her opinion, she is no longer able to perform that work. Because she did not like office work and prefers being outdoors, she quit her secretarial job with A. & M. Pest Control. She described herself as mentally unfit for secretarial work. While she can drive a truck, she cannot do it on a regular basis because the job requires one position for a long period of time. Since her activity is restricted; she cannot work as a deck hand because it requires washing the boat and climbing on iron ladders. She said it was hard to maintain balance on a boat with two good legs.
Ms. Guillory's income in 1977 was $2,920 from A.R.A. Catering and Petroleum Helicopters. She can do most of the tasks she performed as a galley hand, but cannot tolerate the long hours on her feet. She owned the bike on which she was injured, a Harley Davidson Sportster 1000, which she purchased for $3,500. In 1978, she moved home with her parents to enjoy the bike and earned only $512 working for PVR Offshore. Although she had had motorbikes from the age of nine or ten, this was the first bike she had bought herself.
In 1979, the year of the accident, Ms. Guillory worked for B. & S. Heavy Haulers for seven months and earned $900 as a truck driver doing "hot-shot" hauling.

*1286 CONCLUSION
Defendants argue that the legislature has prohibited special interrogatories on damages in LSA-C.C.P. art. 1811[5] which states in pertinent part:
"B. In cases to recover damages for injury, death or loss, the court shall submit to the jury special written questions inquiring as to:
* * * * * *
"(4) The total amount of damages sustained as a result of the injury, death or loss, expressed in dollars."
The requirement that the jury award a total dollar figure does not necessarily preclude interrogatories about items of damages. LSA-C.C.P. art. 1812 indicates that this is the correct reading of Article 1811. Article 1812 provides in pertinent part:
"The court may submit to the jury, together with appropriate forms for a general verdict, written interrogatories upon one or more issues of fact the decision of which is necessary to a verdict."
Interrogatories as to items of damages are not only helpful to the jury but an aid to appellate review. See, for example, Campbell v. Chatelain, 286 So.2d 799 (La.App. 4 Cir.1973). The trial court has discretion to decide whether to submit special interrogatories to a jury. Hocut v. Insurance Company of North America, 254 So.2d 108 (La.App. 3 Cir.1971), writ denied 260 La. 411, 256 So.2d 292 (1972); Corceller v. Brooks, 347 So.2d 274 (La. App. 4 Cir.1977), writ denied 350 So.2d 1223 (La., 1977). Submitting special interrogatories to a jury on monetary damages is not an abuse of discretion. Scheer v. Pat O'Brien's Bar, Inc., 404 So.2d 292 (La.App. 4 Cir.1981).
The court of appeal erred seriously in failing to respect the "much discretion" to be accorded the jury's award of damages. LSA-C.C. art. 1934(3). Perhaps they were misled by this court's direction to decide the case on the record, but that instruction did not abrogate the standards of appellate review.[6]
The court of appeal erred in setting aside the award for future loss of earnings. Although Ms. Guillory had a sporadic work history, this is not surprising in a person of only twenty-two years. Like many young people, Ms. Guillory has relied on her parents' support and has had the luxury of trying a variety of occupations. The jury correctly concluded that she will be forced to work in the future. When Ms. Guillory ventures into the job market, her options will be severely limited by her disability. Her work history and her testimony establish a decided preference for physical outdoor employment and this will no longer be possible. The jury apparently believed her testimony that she is mentally unfit for secretarial work. It is clear that Sallie Guillory is substantially handicapped in the job market, and the jury's award of $60,000 for future loss of earnings is supported by the evidence.
There was substantial testimony about the physical pain and suffering Ms. Guillory endured during her hospitalization. The difficulty in controlling her pain exacerbated the situation. Although it is difficult to put a dollar figure on physical pain and suffering, the jury's award of $50,000 for th is item of damages is not an abuse of discretion.
The award of $50,000 for future physical pain and suffering is supported by the evidence that Ms. Guillory will have an arthritic right leg for the rest of what should be a long life expectancy.
Dr. Dieffenbach's testimony about the psychological effects of Ms. Guillory's injury substantiates the awards of $25,000 each for past and future mental anguish. *1287 Ms. Guillory agonized over the appearance of her leg to the extent of undergoing an extremely painful surgical procedure to improve its appearance. She will continue to have substantial mental suffering from her injury. The awards for these items of damages are not excessive.
Ms. Guillory has been effectively crippled by the accident. In all probability she will always have a limp, will never be able to participate in active sports, and will be disabled for the rest of her life. The jury's award of $50,000 for the disability is substantiated by the evidence.
The jury's award of $50,000 for disfigurement is supported by the evidence that Ms. Guillory is severely scarred. In a society that increasingly values physical health and well-being, she must hide her legs and avoid the sun. Such disfigurement is particularly painful to a young girl who is unmarried and at the beginning of her life.
In summary, the jury awarded a total of $250,000 for general damages. The record supports the jury's award; it was within their discretion. The court of appeal erred in substituting its judgment as to the amount of general damages.
There is no contest about the past medical expenses and the court of appeal correctly affirmed the award of $11,359.89. While there is no doubt that there will be future medical expenses and they may well be substantial, the experts were unable to give a dollar estimate as to this item of damages. The jury allowed $75,000 and the court of appeal reduced the figure to $15,000. As Ms. Guillory grows older, her arthritic condition will become worse and it is likely that further surgery will be indicated. Although the possible result and complications of any future surgery are unknown and cannot be fixed with precision, future medical expenses are a legitimate item of damages. Jordan v. Travelers Insurance Company, 257 La. 995, 245 So.2d 151 (1971); Cushman v. Fireman's Fund Ins. Co., 401 So.2d 477 (La.App. 2 Cir.1981). In the absence of any firm monetary estimates by expert witnesses and in view of the amount of past medical expenses, the court of appeal did not err in reducing the award for future medical to the more realistic amount of $15,000.
Even if some of the items of damage have overlapping elements, as defendants contend, the total award for general damages, loss of past and future wages, and past medical is not an abuse of the jury's "much discretion". LSA-C.C. art. 1934(3). Louisiana courts have not been loathe, at least in recent years, to make substantial awards to seriously injured persons. Compare Barber v. St. Francis Cabrini Hospital, Inc., 345 So.2d 1307 (La. App. 3 Cir.1977); Lanclos v. Hartford Acc. & Indem. Co., 366 So.2d 621 (La.App. 3 Cir.1978); and Wexler v. Occhipinti, 378 So.2d 1073 (La.App. 4 Cir.1979), writ denied 381 So.2d 1232 (La., 1980). Except for future medical, the jury's award is supported by the evidence and the court of appeal erred in substituting its judgment for that of the jury.
For the foregoing reasons, the judgment of the court of appeal is reversed and the judgment of the trial court is reinstated, except to affirm the amendment of the award for future medical expenses to the sum of $15,000.
REVERSED. TRIAL COURT JUDGMENT REINSTATED AS AMENDED.
NOTES
[1] Guillory v. Avondale Shipyards, Inc., 414 So.2d 799 (La.App. 1 Cir.1982).
[2] Guillory v. Avondale Shipyards, Inc., 420 So.2d 450 (La., 1982).
[3] Guillory v. Avondale Shipyards, Inc., 433 So.2d 146 (La., 1983).
[4] Guillory v. Avondale Shipyards, Inc., 434 So.2d 563 (La.App. 1 Cir.1983).
[5] Act No. 534 of the 1983 Legislative Session renumbered and amended certain of the Code of Civil Procedure articles relative to jury trial. Article 1812, former article 1811, now provides that all parties may agree to waive submission of special written questions to the jury. Article 1812 is now Article 1813.
[6] See the explanatory concurrence by Watson and Lemmon, J.J., at 433 So.2d 146.