569 So.2d 143 (1990)
Ronald HOLLIDAY, et al.
v.
UNITED SERVICES AUTOMOBILE ASSOCIATION, et al.
No. 89 CA 1691.
Court of Appeal of Louisiana, First Circuit.
October 16, 1990.
*144 Reginald Badeaux, Jr., Metairie, for plaintiffs-appellees.
Timothy Schafer, New Orleans, for defendants-appellants.
Before LOTTINGER and CARTER, JJ., and DOHERTY, J. Pro Tem.
LEWIS S. DOHERTY, III, Judge Pro Tem.[*]
Gretchen Holliday (plaintiff) was injured while riding as a guest passenger in an automobile owned by Joseph Crain, and driven by his minor daughter, Danette Crain. Ms. Crain lost control of the vehicle while traveling on a rural stretch of road in northern St. Tammany Parish on or about April 26, 1986. After the car left the roadway, it struck a ditch bank and flipped over, injuring plaintiff and other passengers. No other vehicle was involved in the accident.
Ronald Holliday, on behalf of his minor daughter, brought suit against Danette Crain's parents and their insurer, United Services Automobile Association (defendants), seeking to recover for the injuries sustained by his daughter.[1] After a trial held solely on the issue of damages, the jury awarded the plaintiff the following amounts:

Pain and suffering .............$100,000
Mental anguish....................25,000
Disabilities......................25,000
Future medical expenses...........75,000
Loss of life's enjoyment..........25,000

Because the parties reached an agreement as to past medical expenses, these expenses were excluded from the verdict.
*145 Defendants appealed to this court. They seek to have the award for future medical expenses reversed or reduced to a minimal amount. In essence, their argument is based on the fact that the plaintiff failed to present evidence establishing the frequency and cost of any future medical treatment.
Plaintiff answered the appeal contending that in light of the seriousness of her injuries the amount awarded for general damages is inadequate and should be increased.

GENERAL DAMAGES
Before a jury award for damages can be questioned as inadequate, the reviewing court must look first, not to prior awards, but to the individual circumstances of the present case. A damage award should not be disturbed by a reviewing court absent a showing of a clear abuse of the discretion vested in the jury. Reck v. Stevens, 373 So.2d 498 (La.1979); Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976).
Resorting to prior awards in similar cases is proper only after an articulated analysis of the facts discloses an abuse of discretion. Reck v. Stevens, 373 So.2d at 501.
The appropriate procedure for testing whether the trier of fact has abused its discretion in making an inadequate award is to determine whether the award can be supported under the interpretation of the evidence most favorable to the defendant. Schexnayder v. Carpenter, 346 So.2d 196 (La.1977); and Wilson v. Aetna Casualty and Surety Co., 401 So.2d 500 (La.App. 2d Cir.1981). Thus, we must examine the facts contained in this record, in the light of the above mentioned standard, to determine whether the jury abused its discretion.
After the accident plaintiff was admitted to the East Jefferson General Hospital in Metairie, Louisiana. She suffered from lacerations to her head, a broken rib and complained of severe neck and upper extremity pain. When x-rays revealed fractures in the cervical spine, she was referred to Dr. William J. Johnston, a neurosurgeon, for neurosurgical evaluation. His examination, which included among other things a CAT scan and myelogram, revealed weakness in the right upper extremity muscles, decreased sensitivity, and hyperactive deep tendon reflexes. These symptoms indicated injury to the spinal cord and nerve circuitry. Dr. Johnston also determined that, because bones in the spine had been cracked and broken and because muscle and ligaments surrounding those bones had weakened, the cervical vertebrae located at C4 and C6 were slipping forward and impinging on the spinal cord.
In response to these findings, Dr. Johnston ordered plaintiff placed in intensive care and maintained in cervical tong traction. This procedure consisted of screwing a tong-like device into the skull and attaching a ten-pound weight to it. It is used to attempt to bring the spine into normal alignment The only significant movement engaged in by the plaintiff during this period was the daily motion therapy ordered for her paralyzed right upper extremity. On April 30, 1986, Dr. Johnston and his associates attempted to begin to mobilize the plaintiff by placing her in a cervical collar. Unfortunately, the collar did not provide enough support to prevent continued slippage, and Dr. Johnston ordered plaintiff back into cervical tong traction on May 1, 1986.
Because the doctors realized that the plaintiff could not indefinitely remain bedridden, they decided to use a considerably more substantial brace than the cervical collar. After one aborted attempt, a halo brace was installed on May 6, 1986, after an additional CAT scan, myelogram, and lateral cervical spines were performed. After the brace was installed, plaintiff remained in intensive care for more testing and for numerous adjustments to the brace.
On May 14, 1986, after tests revealed that her bone alignment was optimal and her neurological condition was stable, plaintiff was transferred from intensive care to the general floor. Until her release from the hospital on May 21, 1986, she remained *146 on the general floor going to physical therapy twice a day. Although this period of convalescence was relatively uneventful, it is worthy to note that she developed a rash in reaction to her medication and which was aggravated by the sheepskin lining of the halo brace. The rash consisted of large whelps over her body and contributed significantly to her discomfort until finally brought under control.
After her release from the hospital, plaintiff continued her convalescence confined to her home in the care of her mother and older sister until August 8, 1986, when the halo brace was removed. She depended on her mother to drive her to and from her physical therapy sessions, and relied on her sister to feed and bathe her, since she still suffered from paralysis of her right upper rotators and deltoid muscles.
After three months of wearing the brace, an additional CAT scan and myelogram revealed that the attempt at conservative treatment had failed; slippage was still occurring in the neck at the fifth cervical vertebra. Plaintiff underwent cervical fusion on August 13, 1986. Stainless steel wire was wound over and under the involved lamina, and the cervical vertebrae at C4-C6 were fused with bone taken from the plaintiff's pelvic region. Plaintiff remained in the hospital until discharged, wearing a cervical collar, on August 20, 1986.
The record indicates plaintiff's post-operative recovery went well under the circumstances. Follow-up visits to Dr. Johnston revealed continued improvement in strength and use of her right upper extremity, but with continued complaints of pain. Plaintiff was officially discharged from Dr. Johnston's care on August 17, 1987, about a year and a half after the accident.
We have in some detail outlined the long and painful course of plaintiff's treatment. Although plaintiff's current prognosis is good, testimony revealed that she will continue to suffer from some loss of motion in her neck, some decrease in strength in her right hand, and atrophy of her dominant right arm. She will also have occasional "flare-ups" that will require medical treatment whenever she overextends herself physically.
We have reviewed the record and the pertinent jurisprudence thoroughly. Taking into account that plaintiff was in the halo brace for almost three and one-half months and the related discomforts associated therewith, the lowest amount a reasonable fact finder could award for her past and future pain and suffering is fixed at $200,000.00; the lowest amount a reasonable fact finder could award for mental anguish is fixed at $50,000.00.

FUTURE MEDICAL EXPENSES
Because the plaintiff failed to introduce evidence establishing the cost or frequency of future medical treatment, the defendants seek to have the jury award for future medical expenses reversed or reduced to a minimal amount.
Future medical expenses are a legitimate form of recovery, even though they are not susceptible of precise mathematical calculations. However, awards will not be made in the absence of medical testimony that they are indicated and setting out their probable cost. Weston v. Bayou Sale Contractors, Inc., 506 So.2d 818 (La.App. 1st Cir.1987). However, when the need for future medical care has been demonstrated but cost is not susceptible of determination, the court may make a reasonable award. Guillory v. Avondale Shipyards, Inc., 448 So.2d 1281 (La.1984); Jordan v. Travelers Insurance Co., 257 La. 995, 245 So.2d 151 (1971).
All of the testifying physicians agreed that plaintiff will need some type of future medical treatment. The doctors unanimously were of the opinion that plaintiff will develop degenerative disc disease above and below the fused area in the future, and that this arthritic condition will likely need treatment with medication. The testimony of the physicians also indicated that follow-up treatment will be required whenever plaintiff engages in excessive activity which causes an increase in her symptoms. Medical testimony also revealed *147 that it is possible plaintiff will have to undergo future surgery.
Thus, the record reflects that future treatment is needed; however, evidence establishing the frequency and cost of future treatment is conspicuously absent from the record. As stated in Poche v. Frazier, 232 So.2d 851, 860 (La.App. 4th Cir.), writ denied, 256 La. 266, 236 So.2d 36 (1970), "[t]his court cannot pull a figure out of the air and award it as damages for future medical expenses, the occurrence of which is but a speculative possibility." Therefore, in the absence of any firm monetary estimates by expert witnesses and in view of the amount of past medical expenses which totalled less than $45,000, we conclude that the award of $75,000 for future medical expenses is not supported by the record. Guillory, 448 So.2d at 1287.
Nevertheless, we have the parties' stipulations that were admitted into the record, from which we can extrapolate future medical cost. See Davis v. Husgvarna Motor, 561 So.2d 847, 855 (La.App. 2d Cir. 1990), which held that bills for past medical expenses admitted into evidence could be used to establish the cost of future medical expenses. Moreover, in closing, defendants' attorney broached the subject of future medical expenses after plaintiff's attorney's closing argument failed to address the issue. Counsel for defendant acknowledged that plaintiff will need future medical care from time to time and that $10,000 properly invested would produce enough to cover the cost of any future medical treatment.[2] Although his closing statement is not an admission in the classical sense, it may be treated as an acknowledgment of the likelihood of such expense and may be used to establish that plaintiff will in fact need frequent future medical care and forms the basis for establishing a reasonable award. Based upon the unique facts presented by this case, we find that the jury award of $75,000 for future medical expenses was not supported by the record, and constitutes an abuse of the discretion granted to juries in the assessment of damages; furthermore, we reduce the award for future medical expenses to $10,000 as acknowledged by defense attorney as reasonable.
For the reasons stated, the judgment of the trial court is amended as follows:

Pain and Suffering..........$200,000.00
Mental Anguish............... 50,000.00
Disabilities................. 25,000.00
Future Medical Expenses ..... 10,000.00
Loss of Life's Enjoyment .... 25,000.00

AFFIRMED AS AMENDED.
NOTES
[*] Judge Lewis S. Doherty, III, retired, is serving as judge pro tem by special appointment of the Louisiana Supreme Court to fill the vacancy created by the temporary appointment of Judge Melvin A. Shortess to the Supreme Court.
[1] By the time of trial, both plaintiff and defendant had attained the age of majority, and they had been added to the suit as parties in their own right.
[2] "I said that I was trying to be reasonable, and I recognize that counsel didn't mention one thing that I have on the board there and I'm going to mention. Certainly Dr. Johnston said that Gretchen Holliday need not come back for periodic checkups. So I could say, well, there's no testimony from Dr. Johnston that she's going to need any future medical care. And Mr. Bedeaux hasn't argued that. But, again, I'm trying to maintain that credibility with you and approach this reasonably and let you know my thought process. There is no doubt that she will have some flare-ups. There will be times when she engages in some activity which takes her beyond what she should have done, and she will have the sore neck, and she may want to go in for a checkup. If we take the sum of ten thousand dollars and say, Gretchen Holliday, take ten thousand dollars, put it in a CD, let it draw interest at six or seven percent, and that will give you six hundred, seven hundred dollars a year to go to the doctor when you have a flare-up and see about it or take care of the medication that you need when you do have a flare-up and you want to take something for it. And I suggest, ladies and gentlemen, that that would take care of that future expense which I think will occur."