STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

CECE SLOAN

VERSUS

RENEE MOUTON, ET AL.


**********

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 08-C-1866-C
HONORABLE ALONZO HARRIS, DISTRICT JUDGE

**********

ULYSSES GENE THIBODEAUX
CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Jimmie C. Peters, and Billy Howard Ezell, Judges.


AFFIRMED AS AMENDED.

John Edmund McElligott, Jr.
Kyle Liney Mark Gideon
Theodore Glenn Edwards, IV
Christopher Joseph Piasecki
Davidson, Meaux, Sonnier, McElligott, Fontenot, Gideon & Edwards
P. O. Box 2908
Lafayette, LA 70502-2908
Telephone:  (337) 237-1660
COUNSEL FOR:
        Plaintiff/Appellee - Cece Sloan

Michael J. Breaux
Michael J. Breaux, L.L.C.
P. O. Box 51106
Lafayette, LA 70505-1106
Telephone:  (337) 235-8000
COUNSEL FOR:
        Defendant/Appellant - Shelter Mutual Insurance Co.

**THIBODEAUX, Chief Judge.**

The plaintiff, CeCe Sloan, sustained injuries when her vehicle was struck by the vehicle of an underinsured driver. The defendant, Shelter Mutual Insurance Company, appeals from disputed elements in the jury verdict and the judgment awarding damages to the plaintiff. Ms. Sloan answered the defendant's appeal and assigns various errors in the jury verdict and the judgment. For the following reasons, we amend in part and affirm the judgment of the trial court.

## I.

## ISSUES

We must decide:

(1) whether the trial court manifestly erred in granting additur and increasing the plaintiff's general damages by $70,000.00;

(2) whether the trial court manifestly erred in finding that the defendant had accepted the additur and waived its option for a new trial on damages;

(3) whether the trial court manifestly erred in finding that the accident caused the injuries to the plaintiff's shoulders and thumbs;

(4) whether the trial court manifestly erred in denying the plaintiff's motions in limine based upon the defendant's ex parte communications with the plaintiff's physicians;

(5) whether the jury manifestly erred in its award of only $1,600.00 in future medical expenses; and,

(6) whether the jury manifestly erred in its award of $11,000.00 for past lost wages and zero for future lost wages.

## II.

## FACTS AND PROCEDURAL HISTORY

CeCe Sloan, age fifty-five at the time of trial, was injured in a motor vehicle accident in April of 2007, when the driver of another vehicle ran a stop

sign, striking her vehicle and causing her to spin around and crash into a telephone pole. She sustained injuries to her head, chest, shoulders, arms, thighs, knees, and hands, including deep tissue bruising, the development of large cysts in her breasts, torn ligaments in her hands, and severe carpal metacarpal joint laxity in her thumbs. Her injuries required surgery to both hands with the placement of screws and pins into the joints. Ms. Sloan had nightmares after the crash and suffered anxiety, depression, sleeplessness, and nervousness.

The tortfeasor, Renee Mouton, and her insurer, U.S. Agencies Casualty Insurance Company, stipulated to liability, and Ms. Sloan settled with them for their policy limits of $10,000.00. Ms. Sloan received $5,000.00 in medical pay and $15,000.00 in tender from her uninsured-underinsured motorist (UM) carrier, Shelter Mutual Insurance Company. She proceeded to trial against Shelter for the remainder of her damages. The jury found that the accident had caused Ms. Sloan's injuries and awarded her $120,450.00 in total damages. The jury's award was comprised of:

| | |
|---|---|
| $ 47,850.00 | Past medical expenses |
| $ 1,600.00 | Future medical expenses |
| $ 11,000.00 | Past lost wages |
| -0- | Loss of future earning capacity |
| $ 20,000.00 | Past and future physical pain and suffering |
| $ 10,000.00 | Past and future mental pain and suffering |
| -0- | Loss of enjoyment of life |
| $ 30,000.00 | Permanent disability |
| $120,450.00 | Total damages |

Ms. Sloan filed a motion for additur. The trial judge granted an additur of $70,000.00, increasing the award for physical pain and suffering by $30,000.00 (from $20,000.00 to $50,000.00); increasing the award for mental pain and suffering by $25,000.00 (from $10,000.00 to $35,000.00); and adding $15,000.00 for loss of enjoyment of life. The additur resulted in the following awards:

| | |
|---|---|
| $ 47,850.00 | Past medical expenses |

| $   1,600.00 | Future medical expenses |
| $  11,000.00 | Past lost wages |
| -0- | Loss of future earning capacity |
| $  50,000.00 | Past and future physical pain and suffering |
| $  35,000.00 | Past and future mental pain and suffering |
| $  15,000.00 | Loss of enjoyment of life |
| $  30,000.00 | Permanent disability |
| $190,450.00 | Total damages |

Shelter appealed, assigning three errors in the trial court's judgment: (1) the jury's finding of causation; (2) the judge's finding of waiver by Shelter of its right to a new trial; and, (3) the judge's additur in the amount of $70,000.00.

Ms. Sloan answered the appeal, assigning errors of her own in the trial court's judgment: (1) the judge's failure to exclude testimony following ex parte communications between Shelter and two physicians; (2) the jury's failure to award a reasonable amount for past lost wages and future loss of earning capacity; and, (3) the jury's failure to award a proper amount for future medical expenses.

We amend the award of future medical expenses by increasing it from $1,600.00 to $10,000.00. We affirm all other awards for the reasons set forth below.

III.

**STANDARD OF REVIEW**

An appellate court may not set aside a trial court's findings of fact in the absence of manifest error or unless it is clearly wrong. *Stobart v. State, Through DOTD*, 617 So.2d 880 (La.1993); *Rosell v. ESCO*, 549 So.2d 840 (La.1989). A two tiered test must be applied in order to reverse the findings of the trial court:

a. the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and

b. the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).

3

*Mart v. Hill*, 505 So.2d 1120 (La.1987).

IV.

## LAW AND DISCUSSION

### *Causation*

Shelter contends that the jury erred in finding that the injuries to Ms. Sloan's hands and shoulders were caused by the motor vehicle accident. Shelter concedes that the evidence on causation was conflicting. It, nonetheless, argues that the credible evidence was that Ms. Sloan's shoulder bursitis and thumbs laxity conditions were not related to the accident. This argument has no merit. To overturn a jury finding, there must be no factual basis in the record to support the jury's determination. *Fleming v. Acadian Geophysical Services, Inc.*, 02-264 (La.App. 3 Cir. 10/02/02), 827 So.2d 623, *writ denied*, 02-2717 (La. 1/10/03), 834 So.2d 440.

Here, three physicians testified that Ms. Sloan's shoulder and hand injuries were causally related to the vehicular accident on April 6, 2007. Dr. Mitchell Dugas, Dr. Peter Vizzi, and Dr. Darrell Henderson, who performed the bilateral reconstructive hand surgeries, all positively testified regarding causation as to Ms. Sloan's injuries. Shelter argues that Dr. Dugas, Ms. Sloan's internist who treated her from April to November after the accident, did not record any complaints regarding her hands and shoulders, indicating that these problems were not related to the accident. Dr. Dugas, however, testified that, based upon his review of her entire chart and radiology reports, the shoulder and thumb issues were related to the April 6, 2007, motor vehicle accident.

Dr. Dugas first saw Ms. Sloan on April 24, 2007, and his major focus at that time was the lumps in her breasts, the crying, nightmares, sleeplessness, anxiety, and intrusive thoughts of the accident. He was concerned about cancer

4

and ordered an ultrasound and mammogram of her breasts. He ruled out cancer, determining that the lumps were due to fluid build-up caused by deep tissue bruising and bleeding into the chest as a result of the injuries suffered in the automobile accident. Dr. Dugas did note issues with muscular pain and range of motion issues in the neck and bilateral shoulder area. On her third visit, Ms. Sloan had shortness of breath issues. Due to the trauma of the accident and the chest injuries, Dr. Dugas was concerned with her heart and lungs. He ordered chest x-rays, ultrasound, and an EKG. When he saw Ms. Sloan in October of 2007, he documented a sharp pain in her left hand and found crepitus, or crunching and popping, when he palpated it. He gave her steroid injections. By November, Ms. Sloan had bilateral thumb pain and lingering right shoulder pain. Dr. Dugas ordered x-rays of her right shoulder and referred her to the orthopedic surgeon, Dr. Peter Vizzy.

Dr. Vizzy testified that Ms. Sloan's shoulder injuries and her thumb injuries were consistent with trauma from the motor vehicle accident where she was struck from the front, spun around, and was struck from the back. Dr. Vizzy found painful response and breakaway weakness in her shoulder, consistent with impingement bursitis, a tendonitis condition, and rotator cuff impingement, objectively confirmed on an MRI. Dr. Vizzy treated her shoulder with injections. Her shoulder was getting stronger and was about seventy percent (70%) improved by late January of 2008, but it was not without pain at this point.

With regard to her hands, Dr. Vizzy testified that Ms. Sloan had point tenderness at the carpal metacarpal (CMC) joint on both hands, which is at the base of the thumbs, at the very bottom. When he palpated these areas, the thumbs actually subluxed, or came in and out of their joints. Dr. Vizzy's December 2007 x-rays, as well as the x-rays from November of 2007, showed the joint laxity in her thumbs but did not show any degenerative joint disease. Dr. Vizzy testified,

5

however, that the joint condition can lead to arthritic changes. He testified that her previous physical therapy and hand braces had stopped helping and he injected Ms. Sloan's thumbs with a steroid called Kenalog. When he saw Ms. Sloan in March of 2008, he talked to her about the possibility of surgery. By August of 2008, Ms. Sloan was developing arthritis due to inflammation in the CMC joints caused by the movement/laxity.

Dr. Vizzy confirmed that people like Ms. Sloan, who suffer multiple injuries over their bodies in accidents such as hers, hurt so much from injuries to their major extremities that they do not describe pain, or even broken bones, in their fingers, toes, ankles, and other small bones until months after the accident. Thus, he customarily tells emergency room patients to let him know if new pains become apparent. Dr. Vizzy specifically testified that the mechanism of injury to both of Ms. Sloan's hands was very consistent with someone holding on to the steering wheel with both hands and being impacted during a crash, and that more likely than not, the trauma from the automobile accident produced the subluxation and CMC joint laxity. He further testified that because Ms. Sloan's problems were not due to a degenerative condition, but involved a ligament and stability situation, he wanted a hand specialist to see her. He referred her to Dr. Robert Morrow. Dr. Vizzy testified that because hand surgery is aimed at relieving pain, but is not expected to completely restore strength and function, it should not be rushed into and could reasonably involve multiple people, including Ms. Sloan's ultimate choice of having the surgery some time later by Dr. Henderson.

Dr. Morrow saw Ms. Sloan about eleven months after Dr. Vizzy's treatment. Dr. Morrow ordered an MRI of Ms. Sloan's hands in December of 2008, nineteen months after her accident. He found degenerative changes with some spur formation and testified that thumb laxity can occur without trauma and is more likely to develop in women over age fifty than in men. Dr. Morrow said he

6

did not have enough information to relate the thumb problems to the accident and ultimately opined that it was more probable that they were not related. He did, however, recommend hand surgery to Ms. Sloan. Orthopedic surgeon Dr. Gary Porubsky, who examined Ms. Sloan in August of 2009 on behalf of Shelter, did not relate her thumb problems to the accident, opining that they were age-related and that she would have complained to Dr. Dugas before October of 2007 if the injuries were due to the April accident.

Dr. Darrell Henderson, a hand surgeon in Lafayette for forty-four years, saw Ms. Sloan in May of 2010. He performed reconstructive surgery, called first metacarpal arthroplasty, on her right hand in August of 2010 and on her left hand in late December of 2010, shortly before trial. Dr. Henderson testified that her hand injuries were definitely caused by trauma and were the result of holding so tightly to the steering wheel with both hands that when the airbag did not deploy, all of her force pushed on the steering wheel which basically pushed back on the base of her thumbs tearing the ligaments in the thumbs. He testified that when he went in to reconstruct the ligament that runs from the base of the thumb, the first metacarpal, to the second metacarpal, he found the ligament "torn apart very cleanly from the base of the second metacarpal." Dr. Henderson said it was just lying there, and he was able to "very effectively use it to reattach that tendon to the second metacarpal."

Dr. Henderson illustrated the mechanics of the injury to the jury and distinguished subluxation caused degeneratively by arthritis and subluxation caused by injury. Dr. Henderson testified that when he operated on Ms. Sloan in December of 2010, he had done five exact operations that month, and only one patient had degeneration from arthritis, while the others were trauma victims who had had some kind of accident. He said that Ms. Sloan did not have arthritis

7

throughout the joint, which was pristine except for the spurs that had grown into the joint some time after the accident.

Accordingly, based upon the testimony of Dr. Dugas, Dr. Vizzy, and Dr. Henderson, the jury clearly had a reasonable basis for finding that the accident caused the injuries to Ms. Sloan's shoulders and hands.

*Additur*

Shelter contends that the trial judge erred in increasing Ms. Sloan's general damages by $70,000.00. We disagree with Shelter and affirm the trial court's granting of additur. The jury's original verdict awarding only $60,000.00 was abusively low where it was to cover all physical pain and suffering, past and future, all mental pain and suffering, past and future, loss of enjoyment of life, and permanent disability.

Specifically, at the end of trial, the jury awarded Ms. Sloan $30,000.00 for permanent disability, $20,000.00 for past and future physical pain and suffering, $10,000.00 for past and future mental pain and suffering, and zero for loss of enjoyment of life. Pursuant to La.Code Civ.P. art. 1814, the trial judge may grant additur if he is of the opinion that the jury's verdict is so inadequate that a new trial should be granted for that reason only. After a hearing on Ms. Sloan's motion for additur, the trial judge found three awards inadequate, and he increased the physical pain and suffering award to $50,000.00; he increased the mental pain and suffering award to $35,000.00; and, he awarded $15,000.00 for Ms. Sloan's loss of enjoyment of life. "In reviewing a judgment reformed in accordance with a remittitur or additur, the court shall consider the reasonableness of the underlying jury verdict." La.Code Civ.P. art. 2083(B).

Here, the record reveals that Ms. Sloan suffered painful physical injuries as a result of the accident, and her mental injuries were severe enough to

8

cause post-traumatic stress in the form of nightmares and intrusive thoughts during the day, an inability to sleep, nervousness and anxiety. The record reveals that during the accident, Ms. Sloan held so tightly to her steering wheel with both hands, in order to brace herself for the crash, that the pressure she exerted actually bent and deformed the steering wheel. She suffered blunt force trauma with deep tissue bruising to her chest, and she developed posttraumatic cystic accumulations in her breasts. Ms. Sloan also had severe soft tissue injuries to her head, shoulders, forearms, thighs, and knees, some of which took months to heal. She had stinging pain in the tops of both hands which increased and intensified as her thumb strength weakened, ultimately leading to reconstructive surgeries and impairment to both hands.

Ms. Sloan, historically, had very physical occupations and used her hands extensively in her earlier work as an environmental lab assistant, as a landscape gardener, as a nurse's assistant performing healing touch massage therapies, as a stress counselor performing reflexology therapy, and she was reportedly pursuing a therapy license in reflexology. She also restored houses and enjoyed cooking. Ms. Sloan endured four years of treatment, extensive therapy, two hand surgeries with the possibility of future surgeries, and was left with a permanent impairment to both hands of approximately twenty-five percent. The jury awarded her $30,000.00 for the permanent disability but only $20,000.00 for past and future physical pain and suffering and $10,000.00 for past and future mental suffering.

Louisiana jurisprudence supports the trial judge's finding that additur of $30,000.00 was appropriate for physical pain and suffering in Ms. Sloan's case. *See Miller v. Chicago Ins. Co.*, 306 So.2d 355 (La.App. 3 Cir.), *judgment affirmed*, 320 So.2d 134 (La.1975) (affirmed additur of $20,000.00 to a $21,000.00-award for multiple physical injuries where there was a twenty percent disability, and the

range of general damage awards for similar injuries was $35,000.00 to $100,000.00); *Greer v. State Ex. Rel. Dep't of Transp.*, 06-417 (La.App. 3 Cir. 10/4/06), 941 So.2d 141, *writ denied*, 06-2650 (La. 1/8/07), 948 So.2d 128 (physical pain and suffering awards increased from $3,000.00 to $75,000.00 for shoulder, hip, and knee injuries); *Pertuit v. State Farm Ins. Co.*, 04-176 (La.App. 5 Cir. 6/29/04), 877 So.2d 1101 ($90.000.00 in general damages for injury to right hand); *Boudreaux v. Schwegmann Giant Supermarkets*, 585 So.2d 583 (La.App. 4 Cir. 1991), *writs denied*, 590 So.2d 593, 595 (La.1992) (general damage award increased from $50,000.00 to $75,000.00 for injury to left hand).

Our jurisprudence also supports the trial judge's additur of $15,000.00 for Ms. Sloan's loss of enjoyment of life. "Loss of enjoyment of life, sometimes known as hedonic damages, refers to the detrimental alterations of a person's life or lifestyle or a person's inability to participate in the activities or pleasures of life that were formerly enjoyed." *McGee v. A C And S, Inc.*, 05-1036, p. 4 (La. 7/10/06), 933 So.2d 770, 773. Given the conceptual difference between pain and suffering and loss of enjoyment of life, a separate award for loss of enjoyment of life is warranted and is not duplicative of the award for pain and suffering, if the damages resulting from loss of enjoyment of life are sufficiently proven. *Id*. Here, the impairments to Ms. Sloan's hands prevented her from cooking, gardening, holding her grandchild, and for a while, even holding a glass of water. Ms. Sloan, who was described by friends and co-workers as a "do-er" and outdoor person, was assessed a twenty-five percent impairment to her hands and would not be able to do the hand intensive activities that she had enjoyed before, except in a supervisory capacity, including landscape gardening and some home improvement activities.

In *Basco v. Liberty Mutual Insurance Co.*, 05-143 (La.App. 3 Cir. 8/17/05), 909 So.2d 660, we reversed the jury's rejection of an award for future loss of enjoyment of life and awarded the plaintiff $40,000.00 where decreased

10

range of motion and weakness in his left arm and hand resulted in a permanent impairment of ten to fifteen percent and curtailed the plaintiff's hunting and fishing activities and prevented his dancing and volunteer activities. Accordingly, the trial judge did not abuse his discretion in conservatively increasing the jury's award from zero to $15,000.00 for Ms. Sloan's loss of enjoyment of life.

The record further reveals that Dr. Dugas treated Ms. Sloan with antidepressant medication for crash-related intrusive thoughts, nightmares, anxiety, depression, nervousness, sleeplessness, and crying bouts. Dr. Dugas testified that emotional problems were one of his major concerns initially. These symptoms were confirmed by friends and co-workers of Ms. Sloan. Accordingly, the trial judge's additur of $25,000.00 to the $10,000.00 jury verdict for past and future mental pain and suffering was proper. *See Cluse v. H & E Equip. Servs., Inc.*, 09-574 (La.App. 3 Cir. 3/31/10), 34 So.3d 959, *writ denied*, 10-994 (La. 9/17/10), 45 So.3d 1043 (awarded $40,000.00 for emotional suffering and mental anguish as a result of wrongful conversion of property); *Taylor v. Progressive Sec. Ins. Co.*, 09-791 (La.App. 3 Cir. 4/7/10), 33 So.3d 1081, *writ denied*, 10-1024 (La. 9/17/10), 45 So.3d 1044 (affirmed $125,000.00 for mental anguish to accident victim); *Grieff v. Parish of Jefferson*, 98-1262 (La.App. 5 Cir. 12/13/00), 780 So.2d 425, *writs denied*, 01-330, 01-341 (La. 4/12/01), 789 So.2d 592, 593 (awarding $52,000.00 for past and future mental anxiety suffered after deputy fell from building's steps); *Berthelot v. Aetna Cas. and Sur. Co.*, 623 So.2d 14 (La.App. 1 Cir. 1993) (awarding $50,000.00 in general damages for posttraumatic stress caused by electrical shock from beer dispensing trailer at church fair).

### *Shelter's Waiver of its Option for a New Trial*

Finally, Shelter contends that the trial judge erred in denying Shelter a new trial as an alternative to granting the additur. We disagree. Counsel for

Shelter unequivocally consented to the additur as a procedural matter, stating: "I'm going to consent to the additur under protest and we will waive our right to a new trial, and we'll simply go the appeal route or pay [the additur]." Accordingly, the trial court did not err in finding that Shelter had consented to the additur and waived its right to a new trial. Notwithstanding, Shelter argues that the trial court did not get Shelter's consent in writing earlier in the proceedings. We do not find a requirement that the consent be in writing.

The pertinent statute, La.Code Civ.P. art. 1814, provides as follows:

> If the trial court is of the opinion that the verdict is so excessive or inadequate that a new trial should be granted for that reason only, it may indicate to the party or his attorney within what time he may enter a remittitur or additur. This remittitur or additur is to be entered only with the consent of the plaintiff or the defendant as the case may be, as an alternative to a new trial, and is to be entered only if the issue of quantum is clearly and fairly separable from other issues in the case. If a remittitur or additur is entered, then the court shall reform the jury verdict or judgment in accordance therewith.

The purpose of this legislation is "[to serve] judicial efficiency by allowing the parties to avoid a possibly unnecessary new trial and then to seek appellate review of the correctness of the judgment reformed by additur or remittitur." La.Code Civ.P. art. 1814, Comment (b).

Here, the three-day trial ended on February 24, 2011. Following the jury's verdict, counsel for Ms. Sloan asked counsel for Shelter if he would consent to an additur if the trial court was inclined to grant it. Counsel for Shelter would not commit. Ms. Sloan's counsel filed a motion for additur. A hearing on additur was held on March 25, 2011. The transcript of that hearing is forty-eight pages long. Much argument was heard from counsel for Ms. Sloan in support of additur on several of the jury's awards. Likewise, much argument was heard from counsel for Shelter in opposition to any increase in the jury's awards. At the end of the hearing on additur, the trial judge indicated that he was going to increase three of

12

the jury's awards that he found inadequate and that he would grant the additur as to those awards, as discussed above. Counsel for Shelter did not object further or ask for a new trial at that time.

Counsel for Ms. Sloan prepared a "Final Judgment" and sent it to Shelter's counsel for review. Counsel for Shelter sent correspondence to counsel for Ms. Sloan, objecting to the proposed judgment, stating that the judgment should order Shelter to file a written acceptance or refusal of the additur within a specified period of time. The letter asked that a new judgment be submitted to counsel for Shelter which followed these directions.[1]

Counsel for Ms. Sloan then filed a "Motion to Enter Judgment," attached the proposed judgment, and expressed the belief that Shelter had consented to the additur or waived its objection after the hearing on additur. Shelter filed an opposition to the plaintiff's Motion to Enter Judgment, and the trial court had a hearing on that motion and opposition on April 15, 2011. Finally, at the end of the April hearing, Shelter specifically stated that it waived the consent to additur under protest and preserved its right for appeal.

As stated, we find no requirement for written consent. In *Accardo v. Cenac*, 97-2320 (La.App. 1 Cir. 11/6/98), 722 So.2d 302, cited by Shelter, the record did not contain evidence of an official acceptance or rejection of the trial court's additur. There, where the defendant drafted the judgment and included the additur, the appellate court inferred that the defendant was willing to accept additur "rather than face the alternative of having the matter remanded to the trial court for the granting of a new trial." *Id*. at 307. There, the appellate court stated:

> An appeal of a judgment reformed by additur is allowed
> by La. C.C.P. art. 2083, by either the party seeking the

---

[1]We note that the judgment described and requested by Shelter would not have been a final appealable judgment, and it would have been subject to being set aside by the trial court. *See VaSalle v. Wal-Mart Stores, Inc.*, 01-462 (La. 11/28/01), 801 So.2d 331, holding that a ruling giving defendants a choice between additur and new trial is an interlocutory ruling, not a final judgment, as it does not determine the merits of the action.

reformed judgment or the party adversely affected by the reformed judgment, even after having consented to such. *Hodapp v. American Indemnity Company*, 618 So.2d 32 (La.App. 3 Cir.1993); *Karl v. Amoco Production Company*, 492 So.2d 1279 (La.App. 3 Cir.1986). In such cases, the party is said to have consented under protest, thereby preserving its right to appeal. *See, e.g.*, *Fleming v. Smith*, 93-488 (La.App. 5 Cir. 5/31/94), 638 So.2d 467; *Richard v. Domingue*, 542 So.2d 797 (La.App. 3 Cir.1989). Accordingly, the trial court did not act without authority in granting an additur, with the defendant's consent, and in denying plaintiffs' alternative request for a new trial. Further, the plaintiffs and the defendant both have the right to appeal the granting of the additur; thus, the appeal is properly before us.

*Id*. (footnote omitted).

Similarly, the court in *Cox v. Julian*, 03-107 (La.App. 5 Cir. 5/28/03), 846 So.2d 986, found that the defendant tacitly agreed to additur where the record did not indicate that the defendant agreed to or objected to the additur. There, the court reasoned that the appeal was devolutive and that the defendant had already paid the judgment amount which included the additur.

In *Corbello v. Iowa Production*, 01-567 (La.App. 3 Cir. 12/26/01), 806 So.2d 32, *aff'd in part and rev'd in part*, 02-826 (La. 2/25/03), 850 So.2d 686, where the record contained no transcript of the hearing on the motions for a judgment notwithstanding the verdict, or new trial, or remittitur, we stated: "Nothing in the record indicates that Plaintiffs were given the opportunity to choose a new trial on the issue, rather than the remittitur. Accordingly, we conclude that the trial court committed error when it granted the remittitur." *Id*. at 39. Conversely here, while the trial court did not specifically ask for written consent and give Shelter additional time to decide, we do not find reversible error because opportunity was presented to Shelter at the end of trial, by the plaintiff, and at the end of the hearing on additur, one month after the jury entered its verdict, and Shelter did not commit to or ask for a new trial. As previously indicated, the transcript on the hearing on additur is forty-eight pages long. The

purpose of additur is judicial economy, as explained above. In this case, Shelter not only failed to commit to a new trial twice, but Shelter caused an additional hearing on a "Motion to Enter Judgment" six weeks after the hearing on additur and over two months after the jury verdict.

## *Ex-Parte Communications*

In answering Shelter's appeal of the above three issues, Ms. Sloan has assigned errors of her own. She contends that Shelter engaged in ex-parte communications with Dr. Mitchell Dugas, and with Dr. Robert Morrow, and that Shelter's examination of those physicians at trial should have been excluded by the trial court. We find that the ex-parte communications were in absolute violation of La.Code Evid. art. 510,[2] which provides a privilege for communications between a personal injury litigant and her physician, except for trial testimony and procedurally proper discovery; and, they were in absolute violation of La.Code

---

[2]Louisiana Code of Evidence Article 510 provides in pertinent part:

**B. (1) General rule of privilege in civil proceedings.** In a non-criminal proceeding, a patient has a privilege to refuse to disclose and to prevent another person from disclosing a confidential communication made for the purpose of advice, diagnosis or treatment of his health condition between or among himself or his representative, his health care provider, or their representatives.

**(2) Exceptions.** There is no privilege under this Article in a noncriminal proceeding as to a communication:

> (a) When the communication relates to the health condition of a patient who brings or asserts a personal injury claim in a judicial or worker's compensation proceeding.

. . . .

**E. Waiver.** The exceptions to the privilege set forth in Paragraph B(2) shall constitute a waiver of the privilege only as to testimony at trial or to discovery of the privileged communication by one of the discovery methods authorized by Code of Civil Procedure Article 1421 et seq., or pursuant to R.S. 40:1299.96 or R.S. 13:3715.1.

. . . .

**G. Sanctions.** Any attorney who violates a provision of this Article shall be subject to sanctions by the court.

15

Civ.P. art. 1465.1,[3] which mandates the release of a plaintiff's written medical records, but prohibits verbal communications between the healthcare provider and the party requesting the medical records. Notwithstanding the defendant's violations of these articles, however, we will not reverse the trial court for the failure to exclude the testimony of Dr. Dugas and Dr. Morrow in this case, because the result would be the same.

More specifically, Shelter's counsel met with Dr. Dugas at some time prior to taking his deposition, allegedly to obtain a translation of the doctor's hand written notes. In *Coutee v. Global Marine Drilling Co.*, 04-1293 (La.App. 3 Cir. 2/16/05), 895 So.2d 631, *reversed on Jones Act negligence per se issue*, 05-756 (La. 2/22/06), 924 So.2d 112, we found that the trial court had abused its discretion in allowing the testimony of one of the plaintiff's treating physicians who accepted documents from defense counsel, engaged in telephone conversations, and met with defense counsel. In *Coutee*, we found that, after the ex-parte communication, the physician, who had not previously so noted in his records, offered his opinion that the plaintiff may have intentionally magnified his symptoms. There, we found that this testimony impacted the trial and that, absent the physician's testimony, the case might have been decided differently.

In *Coutee*, however, where the plaintiff did not learn of the communication until the day of trial, we distinguished the defendant's cited case because the communication took place prior to the physician's deposition, and there was ample notice to the plaintiff of the communication and an opportunity to

---

[3]Louisiana Code of Civil Procedure Article 1465.1 provides in pertinent part:

A. Any party may serve upon the plaintiff or upon any other party whose medical records are relevant to an issue in the case a request that the plaintiff or other authorized person sign a medical records release authorizing the health care provider to release to the requesting party the medical records of the party whose medical condition is at issue. The release shall be directed to a specific health care provider, shall authorize the release of medical records only, and shall state that the release does not authorize verbal communications by the health care provider to the requesting party. La.Code Civ.P. art. 1465.1(A).

prepare a rebuttal.[4]  Similar to Coutee, in *Boutte v. Winn-Dixie Louisiana, Inc*., 95-1123 (La.App. 3 Cir. 4/17/96), 674 So.2d 299, we determined that the physician's testimony appeared to have startled the plaintiff's counsel and cast a cloud over the plaintiff's credibility as a witness.

Here, following the ex parte communication before Dr. Dugas' deposition was taken, counsel for Ms. Sloan had the opportunity to question Dr. Dugas, during his deposition, regarding the scope of the meeting.  Subsequently, Dr. Dugas testified that Ms. Sloan's shoulder and thumb injuries were likely related to her automobile accident.  The apparent impact of the ex parte communication that occurred in *Coutee* and *Boutte* does not exist in this case with regard to Dr. Dugas' testimony.

The ex parte communications with Dr. Morrow are more problematic because Shelter wrote to Dr. Morrow and requested a conference and verbal communications with him in violation of La.Code Civ.P. art. 1465.1.  The correspondence further requested Dr. Morrow's assistance in cross-examining Dr. Henderson, whose opinion differed from Dr. Morrow's.  Additionally, counsel for Shelter consulted with Dr. Morrow outside the courtroom immediately prior to trial to go over a medical textbook and to discuss his opinion on joint degeneration and on causation.  The trial court allowed Ms. Sloan's counsel to question Dr. Morrow regarding this last communication just before the jury was brought in.  The trial court then found that counsel for Shelter did communicate with the doctor, but said it was not improper this time.  He then instructed Shelter's counsel not to communicate with any other doctors for the rest of trial without first speaking to opposing counsel or the court.  The trial court then told Dr. Morrow to remain in the witness box, and he called in the jury.

---

[4]*See Hortman v. Louisiana Steel Works*, 96-1433 (La.App. 1 Cir. 6/20/97), 696 So.2d 625, *writ denied*, 97-1919 (La. 11/7/97), 703 So.2d 1268.

Even though Dr. Morrow said that his opinion on causation had not changed since his deposition, the event in the courthouse surprised Ms. Sloan's attorney to some extent and put the court in the position of making a hasty decision on whether to exclude a doctor's testimony immediately before the jury was brought into the courtroom. Notwithstanding, in this case the jury apparently placed more weight on the testimony of Dr. Dugas, Dr. Vizzy, and Dr. Henderson, finding that Ms. Sloan's injuries were causally related to her accident. Therefore, even if the trial court had excluded the testimony of Dr. Morrow, the result would be the same.

We find that, in the instance of the ex parte communications with Dr. Morrow, the written correspondence sought, and the consultation in the courthouse immediately before trial accomplished, verbal communications with the plaintiff's physician that are specifically prohibited by La.Code Civ.P. art. 1465.1. Such violations need not be prejudicial, as the prohibition of verbal communication in La.Code Civ.P. art. 1465.1 is absolute. However, as Dr. Morrow's testimony had no discernible impact on the jury verdict, we will not reverse on this issue.

### *Future Medical Expenses*

Ms. Sloan further contends that the jury manifestly erred in awarding only $1,600.00 in future medical expenses and seeks an increase to $10,000.00 for that element of damages. We agree. Dr. Henderson testified that Ms. Sloan's first metacarpal arthroplasty surgery would likely have to be repeated in each hand in approximately ten years, at a cost of around $11,000.00 per hand. Dr. Morrow testified that she could develop symptoms that would require another surgery, but that he thought it was too early to tell. Dr. Porubsky testified that most people do not have to have the surgery repeated in ten years. At the time of trial, however,

18

Ms. Sloan's left hand was still in a splint from the first surgery, and she had not yet begun physical therapy on the left hand.

Dr. Henderson testified that Ms. Sloan would be in physical therapy for approximately six to nine months before maximum medical improvement was achieved and that her post-surgery physical therapy costs would range from $5,000.00 to $15,000.00, depending upon how well she did. Based upon the foregoing, the jury's award of $1,600.00 for all future medical expenses was an abuse of discretion.

> The award of future medical expenses must be supported by medical testimony indicating both their need and probable cost. *Holliday v. United Servs. Auto. Ass'n*, 569 So.2d 143 (La.App. 1 Cir. 1990). "However, when the need for future medical care has been demonstrated but cost is not susceptible of determination, the court may make a reasonable award." *Id*. at 146 (citing *Guillory v. Avondale Shipyards, Inc*., 448 So.2d 1281 (La.1984), and *Jordan v. Travelers Ins. Co*., 257 La. 995, 245 So.2d 151 (1971)).

*Thibeaux v. Trotter*, 04-482, p. 9 (La.App. 3 Cir. 9/29/04), 883 So.2d 1128, 1133, *writ denied*, 04-2692 (La. 2/18/05), 896 So.2d 31.

Accordingly, we amend the jury's award of $1,600.00 and increase that award by $8,400.00, for a total award of $10,000.00 for future medical expenses.

### *Past Wage Loss & Loss of Future Earning Capacity*

Ms. Sloan contends that the jury manifestly erred in awarding only $11,000.00 in past lost wages, and she seeks an increase to $40,000.00 for that element of damages. We must disagree.

Special damages for lost wages must be proved with reasonable certainty. *Skipper v. Barry*, 99-1433 (La.App. 3 Cir. 3/15/00), 762 So.2d 56. To recover for actual wage loss, a plaintiff must prove positively that she would have been earning wages but for the accident in question. It is the plaintiff's burden to

19

prove the amount of work missed due to injuries caused by the accident. *Boyette v. United Servs. Auto. Ass'n*, 00-1918 (La. 4/3/01), 783 So.2d 1276.

At the time of the accident, Ms. Sloan was a part-time stress counselor with Volunteers of America, working one-on-one with victims of Hurricane Katrina. She began working with them in November of 2005. In 2006, she made approximately $2,000.00 per month. In 2007, she was making $20.00 per hour and averaging 93.57 hours per month. Ms. Sloan's position with Volunteers of America was funded by grants. The organization began phasing out the stress counselor positions and dropped Ms. Sloan from the program on October 30, 2007. For the ten years prior to her employment with Volunteers of America in November of 2005, Ms. Sloan testified that she restored houses and performed healing touch therapy. However, during this period, she did not file tax returns and was listed as a dependent on her partner's tax returns. Ms. Sloan testified that she was listed as a dependent because she was supported by her partner.

The jury also heard testimony that by July of 2007, after the accident in April, Ms. Sloan was traveling to Arkansas to supervise the building of a cabin there. Accordingly, the jury apparently found Ms. Sloan's lost earnings as a result of the accident speculative except for the wages she could have earned at Volunteers of America between the accident in April and the end of the counseling position in October of 2007. Because there is a reasonable basis for the jury's award, we will not disturb it.

Finally, Ms. Sloan contends that the jury manifestly erred in not awarding any damages for her loss of future earning capacity. She seeks $12,000.00 for six months of post-trial therapy and disability to her left hand, which was still in a splint at the time of trial. Again, we must disagree.

In determining a proper award for loss of future wages, the fact finder considers the plaintiff's pre-injury physical condition, work history, consistency of

20

the plaintiff's work, the amount the plaintiff could have earned but for the accident, and the probability that the plaintiff would have continued to earn wages over the remainder of her life. *Dugas v. Derouen*, 01-1397 (La.App. 3 Cir. 7/3/02), 824 So.2d 475, *writ denied*, 02-2131 (La. 11/15/02), 829 So.2d 426.

While Ms. Sloan's hands suffered some impairment, there was medical testimony that she could supervise landscaping and the physical types of work that she had done in the past, and that she could perform the healing touch therapy. However, while Ms. Sloan had gotten to level five of the healing touch training in the 1980's, there was no proof of income from that type of work in the ten years before the accident. Her desires to obtain a license in reflexology, which is more hand intensive, were speculative. Moreover, Ms. Sloan was successfully supervising property development and the building of a cabin in Arkansas in July of 2007 following the accident in April. While that property was allegedly donated, and there was no proof of income from it, the jury could have reasonably determined that Ms. Sloan was not prevented from working and earning income as a result of the accident.

V.

## CONCLUSION

Based upon the foregoing, we amend the trial court judgment to increase the award of future medical expenses from $1,600.00 to $10,000.00, and we affirm the judgment in all other respects. Costs of this appeal are assessed to the defendant.

**AFFIRMED AS AMENDED.**